A97A2358. IN THE INTEREST OF H. L. W. et al., children.
(493 SE2d 637)

BLACKBURN, Judge.

On April 11, 1995, the juvenile court entered an order finding that H. L. W. and K. A. W., the natural children of Sunny Wilson (their mother), were deprived and awarding temporary custody of the children to their paternal grandmother, Rachel Wilson. The grandparents subsequently petitioned to terminate the mother's parental rights. A trial was held on March 26, 1997, following which the juvenile court entered an order terminating the mother's parental rights and awarding permanent custody to the grandparents. The mother appeals this decision, claiming that the evidence was insufficient to support the termination.

"Pursuant to OCGA § 15-11-81 (a), a juvenile court deciding whether to terminate a parent's rights employs a two-prong test, first determining whether there is 'clear and convincing evidence of parental misconduct or inability.' For purposes of this case, a finding of 'parental misconduct or inability' must rest on clear and convincing evidence showing: 1) that the child is deprived; 2) that the cause of the deprivation is a lack of proper parental care or control; 3) that the cause of the deprivation is likely to continue or will not likely be remedied; and 4) that the continued deprivation is likely to cause physical, mental, emotional, or moral harm to the child. OCGA § 15-11-81 (b) (4) (A). If the first prong of the test is met, the trial court then considers whether the termination of parental rights is in the child's best interests." *In the Interest of R. N.*, 224 Ga. App. 202 (480 SE2d 243) (1997).

"The question on appeal is whether, after reviewing the evidence in a light most favorable to the lower court's judgments, any rational trier of fact could have found by clear and convincing evidence that the natural parent's rights to custody have been lost. This Court neither weighs evidence nor determines the credibility of witnesses; rather, we defer to the trial court's factfinding and affirm unless the appellate standard is not met." (Citation and punctuation omitted.) Id.

On appeal, the mother does not contest the juvenile court's findings that the children are deprived and that lack of proper parental care and control is the cause of the deprivation. However, she contends that there was not clear and convincing evidence that such deprivation was likely to continue or that it would cause serious harm to the children. She also contends that there was insufficient evidence that termination of her parental rights was in the children's best interests.

The evidence was sufficient to authorize the court to find that the cause of the children's deprivation was likely to continue. In its

April 11, 1995 deprivation order, the court found that the children were without proper parental care, that the mother had periodically abandoned the children to the care of their grandmother, that the mother abused cocaine, and that the mother had no visible means of support or a stable living arrangement. The court also found that the mother was involved in an abusive relationship with her boyfriend which had exposed the children to domestic violence. At one point, the boyfriend had pushed the mother and children out of a car at 4:00 a.m. on the side of Interstate 85, breaking the mother's ankle and forcing the children to wait in the rain until a passing truck stopped. At the termination trial, there was evidence that Thomas beat the mother and "french kissed" one of the children.

In the deprivation order, the court ordered that the children were to have no contact with the boyfriend, Randy Thomas. Nevertheless, the evidence at the termination trial showed that a year and a half later, in October 1996, the mother attended several parenting classes with Thomas. When asked why Thomas was attending the classes, the mother told a DFCS caseworker that "he was probably going to be around the children if she got the children back." The mother testified at trial that Thomas attended the classes because "he was going to be in my life with my children."

The mother testified at trial that she no longer lived with Thomas. However, the court noted in its order that she had testified similarly at the March 1995 deprivation hearing, although she admitted at trial that she had in fact lived with Thomas through the summer of 1995. The mother testified that she lived with Thomas again from January 1996 until January 1997, at which time she and Thomas were arrested in a stolen vehicle on possession of cocaine charges. The children's grandmother testified that the children continue to be afraid of Thomas. Given the mother's prior false testimony, her continued association with Thomas after the court's order that he have no contact with the children, her history of moving into and out of Thomas' residence, and the fact that she was living with Thomas less than three months prior to trial, the court was authorized to disbelieve the mother's claims that her relationship with Thomas was completely severed.

In addition to her relationship with Thomas, the record reveals that, prior to the termination hearing, the mother exhibited only intermittent interest in her children. After the deprivation hearing, the mother had no contact with the children or their grandparents from June 1, 1995 until late August 1995. Rachel Wilson testified that she did not know where the mother was during this time, and that the children were very upset by the mother's disappearance and thought she was dead. During this period, the mother failed to appear at a citizen's review panel meeting in June. The mother testi-

fied that she was not notified of this meeting; however, she also testified that she had given the court her sister's address for notice purposes, but that she did not tell her sister where she was staying because she was mad at her for testifying against her previously. The mother also failed to appear at a second citizen's review panel meeting in December, telling the grandmother that she overslept.

On February 11, 1996, the mother failed to show up for K. A. W.'s birthday party, although she had said she was coming. She left presents for K. A. W. outside the grandparents' house the next day, but did not come inside or speak to K. A. W. The mother had no further contact with the children or their grandparents until a citizen's panel review meeting on March 20, 1996. At the meeting, the mother told the children she would come see them at the grandparents' house later that day, but did not show up. At the panel review meeting, visitation was scheduled for every Saturday. After showing up for such visitations on the first three Saturdays, the mother did not appear for any further Saturday visitations. She saw the children only two or three times from April 18, 1996 until August 14, 1996.

In August 1996, Diane Wickman, a parenting aide assigned by DFCS, began supervising visitation between the mother and the children on Monday afternoons. After several weeks of visitation, the mother failed to show up at the scheduled meeting place on October 28 and November 11, 1996. Wickman testified that the mother's failure to show up caused the children to believe she must be dead.

After the mother's failures to appear, Wickman tried to contact the mother, but the mother did not return her telephone calls. Wickman went to the scheduled meeting place without the children on November 18, 1996, but the mother again did not show up. The mother testified at trial that she did not return Wickman's calls because she had heard "through the grapevine" that Wickman was in favor of termination and that she was wasting her time.

After seeing the children in an unsupervised visit around Christmas 1996, the mother did not attempt to see the children again until March 1997, shortly before the termination trial. Given the mother's total failure to maintain consistent contact with the children, and her indifference to the effect of her actions upon the children, the trial court was authorized to find that the mother was guilty of mental and emotional neglect of the children. "Deprivation of love and nurture is equally as serious as mental or physical disability." *In re Levi,* 131 Ga. App. 348, 352 (206 SE2d 82) (1974).

In addition to her failure to show interest in her children, the record shows that the mother has failed to comply with court-ordered conditions for reunification. In its deprivation order, the court directed that a reunification case plan be developed. This case plan required the mother to complete a drug and alcohol evaluation and

treatment program. Although the mother testified that she underwent drug and alcohol evaluations, she has failed to complete any of the recommended treatment. The case plan also required the mother to complete a parenting program. The mother attended four out of the twelve parenting classes, but failed to appear for the remainder.

Additionally, the court found that the mother had failed to obtain stable employment as required by the deprivation order. From the summer of 1995 until January 1996, while living with her sister, the mother was paid $40 per week for watching her sister's children. Prior to January 1997, when Randy Thomas was arrested, the mother worked occasionally with Thomas as a plumber's helper, but never received a paycheck in her own name. The mother testified that she obtained employment three weeks prior to trial in Clarksville, Tennessee, where she had moved in with her mother. However, she testified that, under the terms of her probation on a forgery conviction in Jackson County, Georgia, she would have to return to Georgia if she was unable to pay a $900 fine in 60 days. The mother has failed to provide any monetary support for the children since custody was awarded to the grandparents.

The court also found that the mother had failed to obtain stable living arrangements, as required by the deprivation order. She lived in Lawrenceville with Randy Thomas until the summer of 1995, at which time she moved in with her sister in Duluth. In January 1996, after her sister asked her to leave because of her drug problems, she moved back in with Thomas in his trailer in Pendergrass, Georgia. After Thomas was arrested on drug charges, she moved back in with her sister for a short period. In March 1997, she moved in with her mother in Clarksville, Tennessee. However, she indicated that her mother would probably not remain in Clarksville for more than six months.

Although the mother contends she is now willing to take steps to be a proper parent, "judging the credibility of her good intentions was a task for the juvenile court. The decision as to a child's future must rest on more than positive promises which are contrary to negative past fact." (Punctuation omitted.) *In the Interest of M. L.*, 227 Ga. App. 114, 117 (2) (488 SE2d 702) (1997). "[T]he past conduct of the parent is properly considered by the court in determining whether such conditions of deprivation are likely to continue." (Punctuation omitted.) *In the Interest of L. F.*, 203 Ga. App. 522 (417 SE2d 344) (1992). Accordingly, we find that there was sufficient evidence to support the trial court's determination that the cause of the children's deprivation was likely to continue.

There was also sufficient evidence to support the trial court's determination that continued deprivation was likely to result in serious physical, mental, emotional, or moral harm to the children, and

that termination was in the children's best interests. There was evidence that the children were devastated when their mother would repeatedly fail to see them as expected, and that many times they believed their mother must be dead. There was testimony that the children remained terrified of Randy Thomas, with whom the mother continued to have a relationship long after entry of the deprivation order. There was evidence that the children had developed a deep bond with their grandparents, who provided a loving, nurturing, and stable home environment. "[T]he juvenile court was authorized to consider the children's need for a stable home situation and the detrimental effects of prolonged foster care." *In the Interest of M. L.*, supra at 117 (2). Accordingly, the juvenile court did not err in terminating the mother's parental rights. See *In the Interest of J. L. Y.*, 184 Ga. App. 254, 255 (361 SE2d 246) (1987).

*Judgment affirmed. Pope, P. J., and Johnson, J., concur.*

DECIDED NOVEMBER 6, 1997.

*Sherriann H. Hicks*, for appellant.

*Kutner & Bloom, Jeanney M. Kutner, Mary B. James*, for appellee.