A99A0625. IN THE INTEREST OF C. D. A., a child.
(519 SE2d 31)

ANDREWS, Judge.

Ruby Key appeals from the juvenile court's order terminating her parental rights to C. D. A., a boy born on August 25, 1995. Key challenges the sufficiency of the evidence supporting this order. Because there is clear and convincing evidence supporting the termination of rights, we affirm.

On appeal, we must determine

whether, after reviewing the evidence in the light most favorable to the appellee, any rational trier of fact could have found by clear and convincing evidence that the natural parent's right to custody should be terminated. [T]his Court neither weighs evidence nor determines the credibility of witnesses; rather, we defer to the trial court's factfinding and affirm unless the appellate standard is not met.

(Citations and punctuation omitted.) *In the Interest of C. L. R.*, 232 Ga. App. 134 (1) (501 SE2d 296) (1998).

Before terminating a parent's rights, a juvenile court, pursuant to OCGA § 15-11-81 (a), must employ a two-step procedure. *In the Interest of C. L. R.*, supra.

First, the court shall determine whether there is present clear and convincing evidence of parental misconduct or inability as provided by OCGA § 15-11-81 (b). Secondly, if there is clear and convincing evidence of such parental misconduct or inability, the court shall then consider whether termination of parental rights is in the best interest of the child. Parental misconduct or inability is found where (1) the child is deprived, (2) the lack of proper parental care or control by the parent in question is the cause of the child's deprivation, (3) the cause of deprivation is likely to continue or will not likely be remedied, and (4) the continued deprivation will cause or is likely to cause serious physical, mental, emotional, or moral harm to the child. OCGA § 15-11-81 (b) (4) (A).

(Citations and punctuation omitted.) Id.

The evidence at trial, viewed in the light most favorable to the juvenile court's judgment, was as follows. A clinical psychologist testified that Ruby Key had an IQ of 61, which placed her in the mentally deficient range. The psychologist stated that Key was "actively psychotic at the time of testing," and met the criteria for nine different mental illnesses. The test scores further indicated that Key could be chemically dependent, and the record shows that Key admitted that she drank beer every day. As a result of the interview and tests, the psychologist diagnosed Key with probable paranoid schizophrenia and alcohol abuse. The psychologist stated that Key was not capable of parenting children at that time. In response to questions from the court, the psychologist said there were medications that could probably help with the auditory and visual hallucinations and mental confusion; however, it was not likely that the medicine could alleviate all these problems to the extent that Key could function

normally.

A nurse testified that when Key was in the hospital after the birth of another baby, she became angry and started screaming and throwing things. When the nurse tried to talk to her, Key got up from her bed, causing the newborn baby to roll over, face down. The nurse said Key saw the baby lying there, but made no move to pick it up. The nurse then took the baby back to the nursery.

Another hospital worker testified that Key came to the hospital for pre-term labor and tested positive for cocaine and alcohol. When the social service worker tried to discuss this with her, Key denied using drugs and said she drank two or three beers every day and it had not caused problems for her other child and would not cause any problems for this child.

The director of the Henry County Building Department testified that the home where Key was living was unsafe. He said there were gas pipes going into the house, but there were no appliances attached to them; they were just open lines. He further stated that the electrical wiring was old and not connected to any public utility, but rather, was connected by extension cords to a piece of cable running from another house. The building inspector also said he saw no evidence of running water in the house.

A Department of Family & Children Services (hereinafter "DFCS" or "Department") caseworker testified that C. D. A. was first placed with DFCS on September 13, 1995. DFCS returned the child to Key under a protective order. This order provided for weekly visits to Key's home to ensure that the child's needs were being met and required Key to attend parenting classes and notify DFCS if she moved. Key did not attend parenting classes and moved without notifying DFCS. DFCS found C. D. A. after receiving a referral[1] concerning the child and took C. D. A. back into custody on January 5, 1996.

Another caseworker testified that DFCS developed three reunification plans for Key and Key failed to make any significant attempt to take the steps necessary to achieve the goals outlined in the plans. The goal of the fourth and last plan was the termination of Key's parental rights. Key did maintain contact with the child and with DFCS during this time, and she attended some parenting classes. She also apparently worked before she became pregnant with another child, but she did not pay any of the required child support.

1. In her first enumeration of error, Key argues there was insufficient evidence to support a finding of parental misconduct or inability. Key does not argue that the child is not deprived, nor that her

---

[1] The caseworker explained that a "referral" is a call to the Department concerning the abuse or neglect of a child.

inability to care for the child is the cause of the deprivation. However, Key claims that because she has not had the opportunity for psychological treatment, it is not reasonable to conclude that her condition will not improve.

"A mental disability that renders a parent incapable of caring for the child is a valid legal basis for termination." *In the Interest of L. H.*, 236 Ga. App. 132, 135 (511 SE2d 253) (1999). The DFCS caseworker testified that she discussed the psychological evaluation with Key and went over the psychologist's recommendations as a result of the evaluation. The caseworker said she told Key there was a mental health center next door to the DFCS office and Key could go there and the Department would make referrals, provide transportation and help with parenting classes. Key never followed up on the recommendation that she get further psychological evaluation and counseling.

Key also argues that DFCS, after becoming aware of her mental disability, did not do enough to accommodate that disability when setting up the reunification plans. For instance, she argues that the problems with her housing were not explained to her and therefore it was unreasonable to expect her to remedy conditions when she was "unaware of what the problems are."

The DFCS caseworker testified that the Department makes the necessary referrals to clients and assists them in carrying out the reunification plans. The caseworker said she discussed the steps and goals in the plans with Key and Key told her she understood those steps and goals. Further, the caseworker stated that Key did not ask for any help in attaining those goals. A caseworker also testified that the changes necessary to make the home safe were pointed out to Key after one of the home visits.

"The past conduct of the parent is properly considered by the court in determining whether such conditions of deprivation are likely to continue. The decision as to a child's future must rest on more than positive promises which are contrary to negative past fact." (Citation and punctuation omitted.) *In the Interest of L. H.*, supra at 136. Therefore, given the fact that Key did not complete the case plans or make the necessary effort to get help so that she could complete the case plans, there was sufficient evidence from which the judge could find that the deprivation was likely to continue.

2. Key also claims there is insufficient evidence to show that continued deprivation is likely to cause serious physical, mental, emotional or moral harm to the child. We disagree. The unsafe conditions at the home and the psychologist's testimony that Key was actively psychotic and incapable of parenting a child were sufficient clear and convincing evidence from which the juvenile court could conclude that the deprivation could cause serious physical, mental, and emo-

tional harm to the child.

3. Key argues there was insufficient evidence to show termination was in the best interest of the child. After a finding of parental misconduct or inability, the trial court must determine whether termination is in the best interest of the child, taking into consideration the physical, mental, emotional and moral condition and needs of the child, including the need for a secure and stable home. OCGA § 15-11-81 (a). "Those same factors which show the existence of parental misconduct or inability can also support a finding that the termination of parental rights of the defaulting parent would be in the child's best interest." *In the Interest of E. C.*, 225 Ga. App. 12, 18 (482 SE2d 522) (1997). Additionally, the juvenile court is authorized to consider the child's need for a stable home and the detrimental effects of prolonged foster care. *In the Interest of M. L.*, 227 Ga. App. 114, 117 (488 SE2d 702) (1997).

The facts set out above and our review of the entire record show that there was clear and convincing evidence to support the juvenile court's finding that termination of Key's parental rights would be in the best interest of the child.

*Judgment affirmed. McMurray, P. J., and Ruffin, J., concur.*

DECIDED JUNE 2, 1999.

*Brown & Gill, Angela Y. Brown*, for appellant.
*Thurbert E. Baker, Attorney General, Dennis R. Dunn, Deputy Attorney General, William C. Joy, Senior Assistant Attorney General, Shalen A. Sgrosso, Assistant Attorney General, Ernest D. Blount*, for appellee.