A99A0906. IN THE INTEREST OF A. W., a child.
(523 SE2d 88)

RUFFIN, Judge.

Appellant, the natural mother of A. W., appeals from the trial court's order terminating her parental rights. Because the evidence supported the trial court's decision, we affirm.

The decision to terminate parental rights involves a two-step process:

> First, the juvenile court must determine whether there is clear and convincing evidence of parental misconduct or inability. This determination is based on a finding that the child is deprived, the lack of proper parental care or control by the parent is the cause of the child being deprived, the cause of deprivation is likely to continue or will not likely be remedied, and the continued deprivation will cause or is likely to cause serious harm to the child. Second, if the juvenile court finds clear and convincing evidence of parental misconduct or inability, the court considers whether termination of parental rights is in the best interest of the child. On appeal, we determine whether, viewing the evidence in a light most favorable to the lower court's judgment, any rational trier of fact could have found by clear and convincing evidence that the natural parent's rights to custody have been lost.[1]

---

[1] (Citations omitted.) *In the Interest of J. C.*, 237 Ga. App. 533-534 (515 SE2d 847) (1999). See OCGA § 15-11-81.

Viewed in the light most favorable to the trial court's decision, the evidence showed as follows. A. W. was born to appellant on September 10, 1987. Appellant, who was not married at the time, lived in Columbus, Ohio, and worked the night shift at a job about 40-50 miles away. Kimberly Larraby, a friend of appellant's, would babysit A. W. at church. One day when A. W. was about four months old, Larraby showed him to her cousin, Anne Smith, who was visiting from Georgia. Appellant later gave Larraby permission to take A. W. to Georgia for the summer, where he lived with Smith and her husband from March until August 1988. In September 1988, the Smiths went to Ohio to meet with appellant. Appellant told Mrs. Smith that she did not want A. W. to have any contact with his father. She agreed to let the Smiths raise A. W. in Georgia. According to appellant, the Smiths were to raise A. W. until appellant was able to get off the night shift. Appellant testified that "[m]y main purpose was to get off the night shift and get him back so I could be with him in the day-time."

For the next ten years, A. W. lived in Georgia with the Smiths, who assumed all parental responsibility for the child. When A. W. was about a year old, appellant agreed that he should go by the name of Smith, telling Mrs. Smith that "you are the mommy and [Mr. Smith] is the daddy and I have no problems with that." A. W. has used the name of Smith since coming to live with the Smiths. Appellant has provided no financial support for the child, except for a few hundred dollars during the first few years. As the years went by, appellant would call the Smiths less and less frequently, and usually she would speak not to A. W. but to Mrs. Smith. In early 1997, shortly after appellant got married, the Smiths went five months without hearing from her.

On their own initiative, the Smiths would take A. W. to Ohio during the summers to visit Mrs. Smith's family and to see appellant. In addition, A. W. spent a few Thanksgivings and perhaps one Christmas with appellant. During these visits, appellant never indicated that she wanted A. W. to stay. Appellant never came to Georgia to visit A. W. or the Smiths, except on three occasions when she was passing through on her way to Florida and stopped by for a total of about 30 minutes.

In 1991, appellant had a second child by another man. Although appellant was still unmarried and working the night shift, she personally raised this second child. After the second child was born, Mrs. Smith asked whether appellant wished for A. W. to return and live with her. Mrs. Smith testified that, at that point, A. W. was still young enough to make the transition back to living with his natural mother. However, according to Mrs. Smith, "[appellant] told me that [A. W.] is yours and [the other child] is mine as long as I see [A. W.]

from time to time." The Smiths testified that, after they had raised A. W. for a few years and he started attending school, they began to consider the arrangement permanent.

In 1993, about five years after "temporarily" placing A. W. with the Smiths, appellant began working the day shift at a location near her home. Although she claims she wanted A. W. to be returned to her at that time, she did not take any action for the next four years to try and get him back. When asked why she took no action for four years after going on the day shift, appellant testified that she wanted to give Mrs. Smith "time to adjust to the fact. . . . Whatever she need — if she need to replace [A. W.] she can do that."

A. W. continued to live with the Smiths for the next several years. In August 1997, Mr. Smith went to Ohio to pick up A. W., who had been visiting appellant. Smith went to appellant's office and waited for her for two hours, but she would not come out to see him. Smith then went to the house, picked A. W. up, and left "as we have done many, many times before." The next day, appellant drove down to Georgia and unsuccessfully tried to have Smith arrested for kidnapping. She then returned to Ohio and filed an emergency petition in an Ohio court seeking custody of A. W. In an affidavit accompanying the petition, appellant stated that "[i]n the summer of 1997, I brought my son [A. W.] back from Georgia to live with me in Ohio." She later admitted that this statement was not true. The Ohio court initially awarded temporary custody to appellant, but ultimately determined that Georgia had jurisdiction over the matter.

In September 1997, the Smiths filed a deprivation petition in Cobb County Juvenile Court seeking temporary custody of A. W. A deprivation hearing was held on December 5, 1997. In addition to hearing from the Smiths and appellant, the trial court also heard testimony from Dr. Corbett Harold Turner, a child psychiatrist who had interviewed A. W. and the Smiths. Dr. Turner testified that A. W. considered the Smiths to be his parents and was very attached to them. According to Dr. Turner, A. W. said that he was "upset, angry, and disappointed" when he was with appellant. A. W. told Dr. Turner that appellant did not appear to be interested in him and gave him spankings for things he did not do. When Dr. Turner asked A. W. what three wishes he would like to come true, A. W.'s first wish was "not to have to go back to [appellant's] house." Dr. Turner testified that taking A. W. away from the Smiths and returning him to appellant "would have a disastrous effect on his emotional and mental health." Under the circumstances of this case, Dr. Turner testified that "you can only draw the conclusion that the biological mother has in fact abandoned the child and has not displayed responsibility, has been indifferent, has not been a parent." He testified that, at A. W.'s age, it would be impossible for appellant to establish a psychological parent-

ing relationship with him.

After the hearing, the trial court entered an order finding that A. W. was deprived and awarding temporary custody to the Smiths. On June 4, 1998, the Smiths filed a petition for termination of appellant's parental rights. A hearing on the petition was held on October 8, 1998. The transcript of the deprivation hearing was admitted into evidence, and the trial court also heard evidence from the parties. Dr. Turner testified that he had interviewed A. W. on two occasions since the deprivation hearing. He testified that A. W. did not want to have any interaction whatsoever with appellant. A. W. told Dr. Turner that appellant had told him the reason she wanted him to live with her was so that he could watch her other child while she was at work. According to Dr. Turner, if A. W. was required to have continuing contact with appellant it would be a "traumatic experience" for him.

Mrs. Smith testified that she had no contact with appellant for seven months after the December 5, 1997 deprivation hearing. According to Mrs. Smith, appellant called her on July 25, 1998, and then did not call again until October 7, 1998, the day before the termination hearing. She said appellant sent A. W. a card in November 1997, shortly before the deprivation hearing, but did not send him anything for Christmas. Appellant also sent A. W. a birthday card in September 1998, about a month before the termination hearing. Appellant testified that she had sent A. W. three other cards and letters in July and August. Appellant did not come to Georgia after the deprivation hearing to try to visit A. W. On October 20, 1998, the trial court issued an order terminating appellant's parental rights.

As discussed above, in order to terminate parental rights, the trial court must find that there is clear and convincing evidence of parental misconduct or inability and that termination is in the best interest of the child.[2] In order to find parental misconduct or inability, the trial court must find (1) that the child is deprived, (2) that the lack of proper parental care or control by the parent is the cause of the deprivation, (3) that the cause of the deprivation is likely to continue or will not likely be remedied, and (4) that continued deprivation will cause or is likely to cause serious harm to the child.[3]

With respect to the first required finding, the trial court's unappealed deprivation order establishes that A. W. is deprived within the meaning of OCGA § 15-11-81 (b) (4) (A) (i).[4]

---

[2] OCGA § 15-11-81 (a).

[3] OCGA § 15-11-81 (b) (4).

[4] *In the Interest of K. R. C.*, 235 Ga. App. 354, 355 (1) (510 SE2d 547) (1998). Citing *Thrasher v. Glynn County Dept. of Family &c. Svcs.*, 162 Ga. App. 702 (293 SE2d 6) (1982) and *In re J. C. P.*, 167 Ga. App. 572 (307 SE2d 1) (1983), appellant argues that a finding of deprivation based on abandonment of a child requires evidence of actual desertion accompanied by an intention to completely sever the parental relationship. However, the trial court's

With respect to the second required finding, the evidence authorized the trial court to conclude that the lack of proper parental care or control was the cause of A. W.'s deprivation. In determining whether a child is without proper parental care or control, the trial court is to consider the parent's "[p]hysical, mental, or emotional neglect of the child."[5] "Deprivation of love and nurture is equally as serious as mental or physical disability."[6] The evidence in this case shows that appellant wholly abdicated her parental responsibilities toward A. W. for a period of ten years, years which Dr. Turner testified are essential to the development of a parent-child relationship. During this ten-year period, A. W. came to view the Smiths as his parents and never formed a bond with appellant. Although appellant claims that "her intent in making an arrangement with the Smiths to care for A. W. was to find temporary help until she could be rescheduled from the night shift at work," she took no action to try to gain custody of A. W. for four years after she was transferred to the day shift. Appellant testified that she let the Smiths keep custody so as to give them time to "replace" A. W. Appellant was able to raise a second child during the time period when she refused to act as a parent toward A. W. The evidence shows that appellant treated A. W. not as a child to whom she owed any parental obligations, but as an item of personal property that she could loan out and recall when convenient to her. Under all of the circumstances, the trial court was entitled to conclude that the lack of parental care or control was the cause of A. W.'s deprivation.[7]

The trial court was also authorized to conclude that the cause of A. W.'s deprivation was likely to continue. "[E]vidence of past conduct may be considered in determining whether [the] deprivation [of the child] would be likely to continue."[8] This is appropriate because "the juvenile court is not required to reunite [a child] with [his parent] in order to obtain current evidence of deprivation or neglect."[9] The evi-

---

unappealed deprivation order establishes that A. W. was deprived. Moreover, the cases cited by appellant were based on the former OCGA § 15-11-51 (a) (1), which was repealed in 1986 upon the enactment of the current parental rights termination statute. See Ga. L. 1986, pp. 1017, 1018, § 3. Under the current statute, termination is warranted if there is clear and convincing evidence of parental misconduct or inability and termination is in the best interest of the child. OCGA § 15-11-81.

[5] OCGA § 15-11-81 (b) (4) (B) (v).

[6] (Punctuation omitted.) *In the Interest of H. L. W.*, 229 Ga. App. 264, 266 (493 SE2d 637) (1997).

[7] See *In the Interest of J. M. B.*, 231 Ga. App. 875, 878 (1) (a) (501 SE2d 259) (1998) ("appellant's near abandonment of J. M. B. provided clear and convincing evidence that J. M. B. was 'without proper parental care or control' "); *In the Interest of A. M. R.*, 230 Ga. App. 133, 135-136 (495 SE2d 615) (1998).

[8] (Citation and punctuation omitted.) *In the Interest of T. B. R.*, 224 Ga. App. 470, 474 (1) (c) (480 SE2d 901) (1997).

[9] *In the Interest of E. C.*, 225 Ga. App. 12, 16 (482 SE2d 522) (1997).

dence showed that, as the years passed, appellant made less and less effort to stay in contact with A. W. while he was in Georgia. Dr. Turner testified that A. W. never developed a bond with appellant and that, given A. W.'s age, appellant would never be able to establish a psychological parenting relationship with him. As the trial court found, in the ten months between the deprivation hearing and the termination hearing, appellant did not make a significant effort to develop a parental relationship with A. W.[10] Under these circumstances, the trial court was authorized to conclude that the cause of A. W.'s deprivation was likely to continue or would not be remedied.[11]

Appellant does not challenge the sufficiency of the evidence with respect to the final required findings — i.e., that continued deprivation is likely to cause serious harm to the child and that termination is in the best interest of the child. However, we note that Dr. Turner testified that A. W. considered the Smiths to be his true parents, that requiring A. W. to stay in contact with appellant would be a "traumatic experience" for him, and that transferring A. W. to appellant's custody "would have a disastrous effect on his emotional and mental health."[12] The evidence was sufficient to support the trial court's findings on these issues.[13]

Because there was sufficient evidence to support each of the trial court's required findings under OCGA § 15-11-81, the trial court did not err in terminating appellant's parental rights.

*Judgment affirmed. McMurray, P. J., and Andrews, P. J., concur.*

DECIDED OCTOBER 6, 1999.

---

[10] Appellant points out that on December 11, 1997, after the deprivation hearing, she filed a one-page "Motion for Clarification" asking the trial court to "clarify its position on visitation." However, appellant apparently took no further action with respect to visitation until July 10, 1998, more than a month after the termination petition was filed, when she filed a motion seeking visitation rights. Contrary to the suggestion in her brief, appellant's perhaps strategic attempt to obtain visitation rights before the termination hearing did not require the trial court to conclude that the cause of A. W.'s deprivation was likely to be remedied, particularly in light of appellant's failure to take any meaningful steps to establish a relationship with A. W. in the months after the deprivation hearing. To the extent that appellant argues in her brief that the trial court erred in failing to rule on her motion for visitation rights prior to the termination hearing, such issue is outside the scope of her enumeration of error.

[11] See *In the Interest of P. N. L.*, 228 Ga. App. 187, 189 (1) (c) (491 SE2d 434) (1997).

[12] Although appellant argues that it is impermissible for a trial court to consider the best interest of the child in a termination proceeding, OCGA § 15-11-81 (a) *requires* the trial court to consider such issue after finding parental misconduct or inability.

[13] See *P. N. L.*, supra at 189-190; *In the Interest of K. A. C.*, 229 Ga. App. 254, 257 (3) (493 SE2d 645) (1997).

*S. Friedman & Associates, Steven J. Best*, for appellant.
*Land, Cohen & Keon, Stephen A. Land*, for appellee.