A01A1972. IN THE INTEREST OF N. M. H. et al., children.
(556 SE2d 454)

JOHNSON, Presiding Judge.

The biological mother of N. M. H., B. S. H., and G. L. H. appeals the juvenile court's termination of her parental rights, contending that the evidence was insufficient to support the termination.[1] For the reasons below, we affirm.

The standard of review for the termination of parental rights is whether, after reviewing the evidence in the light most favorable to the parent, a rational trier of fact could have found by clear and convincing evidence that the parent's rights should be lost.[2] "This Court neither weighs evidence nor determines the credibility of witnesses; rather, we defer to the trial court's factfinding and affirm unless the appellate standard is not met."[3]

The record shows that the Richmond County Department of Family & Children Services (DFACS) removed the children from the home[4] and placed them in emergency custody on July 3, 1998, following a report to the local sheriff's department that the children were unsupervised. Upon investigation, a deputy sheriff verified that the oldest two children, ages two and three, were playing outside unsupervised and found the youngest, age one, locked in a bedroom. The deputy reported that the youngest child was covered with feces and had severe diaper rash. The milk in the child's bottle was reportedly sour and solidified. The house was in disarray, with open food and dirty dishes in the living room and kitchen, beer bottles and

---

[1] The children's father died in 1999, shortly after a legitimation hearing.

[2] OCGA § 15-11-99; *In the Interest of A. C.*, 234 Ga. App. 717, 718 (507 SE2d 549) (1998).

[3] (Citation omitted.) *In the Interest of R. N.*, 224 Ga. App. 202 (480 SE2d 243) (1997).

[4] The home was the residence of the mother's boyfriend. They had lived with him for approximately one month before the incident.

clothing lying around, and beds without linen. The mother could not be found at the time. The children were taken into custody, and a deprivation hearing was held on July 17, 1998, after which time, in an unappealed order, they were deemed deprived and placed in foster care. There was no family able or willing to care for the children. In December 1998, a court-appointed special advocate was appointed guardian ad litem for the children.

The mother agreed to a reunification plan that required her to (1) meet her mental health needs by obtaining a psychological evaluation and following through with any recommendations, (2) improve her parenting skills, (3) obtain and maintain employment and housing for herself and her children, and (4) visit or contact her children twice monthly. Following the children's removal and upon the suggestion by her caseworker that it might expedite the return of her children, the mother married the children's biological father, Ralph. They separated a short time later, and she moved to South Carolina to live with her mother.

In June 1999, the special advocate reported that the mother had accomplished most of the goals of her reunification plan within the first five months and that she appeared willing to do anything to have her children returned. The special advocate reported that, while the children were thriving in their foster home, there was a true bond between the mother and the children. The special advocate made follow-up recommendations, including the placement of a parent aide in the home and that weekend visits be established before total reunification. Later that month, DFACS moved for a five-month extension of the original removal order for more time to coordinate the reunification of the mother and her children, including a home evaluation of the maternal grandmother's home in South Carolina and the mother's completion of parenting classes.

A custody extension hearing was held thereafter, at which time the special advocate expressed concern over the stability of the mother's housing arrangements. The special advocate reported that prior to the hearing, the grandmother threatened to throw the mother out of her home because of the mother's drinking and unemployment. The juvenile court terminated the temporary custody, and the children were returned to the mother on June 30, 1999.[5]

Approximately two weeks later, upon receiving information that the mother was drinking while driving with the children in the car, the special advocate filed a child protective service complaint with the Aiken, South Carolina Department of Social Services. Before the

---

[5] This was also a legitimation order and showed Ralph to be the legitimate father of the three children.

case could be transferred to South Carolina social service officials, the mother was thrown out of the house, and she and the children moved back to Augusta to live with the children's father. The special advocate met with DFACS staff in August 1999 to discuss the case, after reports from the foster parent, who occasionally babysat for the children, that the children sometimes slept in a car. They also discussed the mother's drinking problem. Another child protective service complaint was filed at that time.

Approximately one week later, the mother was arrested for DUI and endangering children after she was stopped for drinking and driving with the children in the car. While she was in jail, the children were placed with their father. DFACS reported that he initially requested that the children be placed with DFACS on a temporary basis because he was starting a new job and could not keep the children. He reportedly changed his mind, but asked for emergency food vouchers when he and the children were thrown out of his friend's trailer.[6] Another child protective service complaint was filed at that time. After the mother was released from jail, the entire family was staying with the father's friend, but a few weeks later, on September 8, 1999, the mother was once again arrested for DUI. Upon the father's request, the children stayed with the foster parents because he said that he could not feed the children. When the mother was released from jail a couple of days later, she retrieved the children from the foster home.

The special advocate again petitioned DFACS because of concern for the children's safety and the mother's alcohol problems. Based on the special advocate report, the children were once again placed in foster care, and another deprivation petition was filed on September 13. A nonreunification plan was recommended and incorporated in the deprivation order on October 28, 1999. The mother was incarcerated at the time of the hearing because of her third DUI arrest and 60-day jail term.[7] The children were again deemed deprived, and custody was maintained with DFACS for 12 additional months, after which DFACS filed its termination petition on January 14, 2000. About one month prior to the termination hearing, which was held on June 9, 2000, the mother received her third DUI. At the time of the hearing, the children were in DFACS' custody 21 out of the previous 24 months. A termination order was entered on July 19, 2000.

OCGA § 15-11-94 (a) establishes a two-step process in considering the termination of parental rights. The court is required to deter-

---

[6] He and the children thereafter planned to stay at a rescue mission, but the friend let them move back in the trailer.

[7] The father was killed in December 1999 after being struck by a car outside of a bar where he and the mother had allegedly been drinking.

mine whether there is clear and convincing evidence of parental misconduct or inability.[8] And, if there is clear and convincing evidence of parental misconduct or inability, the court considers whether termination of parental rights is in the best interest of the child.[9]

Parental misconduct or inability must be shown by clear and convincing evidence that (1) the child is deprived, (2) the lack of parental care or control is the cause of the deprivation, (3) such lack of care or control is likely to continue, and (4) the continued deprivation will cause, or is likely to cause, serious physical, mental, emotional, or moral harm to the child.[10]

Here the mother does not contest that the first two factors — that the children are deprived and lack of parental care caused this deprivation — were shown. She concedes that there was evidence to support the first two findings. Moreover, she did not appeal the earlier orders finding the children to be deprived.[11] Instead, she argues that the evidence relied upon by the trial court to show parental misconduct did not show that the third and fourth factors were found. Specifically, she claims that there is insufficient evidence the deprivation will continue[12] and that it will cause serious harm.[13] According to the mother, the trial court based its conclusions on three episodes of drinking and driving; this, she maintains, is insufficient to demonstrate that the deprivation would continue. She argues that the evidence does not establish "chronic, unrehabilitated alcohol abuse that would compel the conclusion that past deprivation will likely continue or cannot be remedied." We do not agree.

While a parent's abuse of alcohol does not always compel the termination of parental rights, "[t]he past conduct of the parent is properly considered by the court in determining whether . . . conditions of deprivation are likely to continue."[14] "Such an inference is appropriate, since the juvenile court is not required to reunite [the children] with appellant in order to obtain current evidence of deprivation or neglect."[15]

Although the mother contends she is now willing to take steps to be a proper parent, judging the credibility of her good intentions was a task for the juvenile court. The decision as to a child's future must

---

[8] *In the Interest of C. D. A.*, 238 Ga. App. 400, 401 (519 SE2d 31) (1999).

[9] Id.

[10] OCGA § 15-11-94 (b) (4) (A).

[11] See *In the Interest of E. C.*, 225 Ga. App. 12, 14-15 (482 SE2d 522) (1997) (parent bound by earlier unappealed findings of deprivation).

[12] OCGA § 15-11-94 (b) (4) (A) (iii).

[13] OCGA § 15-11-94 (b) (4) (A) (iv).

[14] (Citation and punctuation omitted.) *In the Interest of L. H.*, 236 Ga. App. 132, 136 (1) (511 SE2d 253) (1999).

[15] (Citation omitted.) *In the Interest of E. C.*, supra at 16.

rest on more than positive promises that are contrary to negative past fact.[16] While the mother testified that she would stop drinking in order to get her children back and that she was going to counseling once a week, she relapsed and received a DUI one month before the termination hearing. She testified that she relapsed because, "I'm real emotional. I'm having a lot of problems and everything." Her current boyfriend, her mother, and her mother's fiancé all testified at the hearing on her behalf. These current relationships, however, do not reflect the type of support the mother may need to overcome her abuse of alcohol. Although her current boyfriend, with whom she lives, testified that he drinks only on occasion and does not keep alcohol in the home, he was charged with DUI two months before the deprivation hearing. The maternal grandmother, who testified that although her daughter has a drinking problem, her children should not be taken away, also admitted that she received a DUI sometime in 1999. She claimed, however, that she stopped drinking in January 2000.

Additionally, the evidence shows noncompliance with the reunification plan's requirement that the mother obtain a safe, stable, and healthy environment for the children.[17] Although the mother testified that she lived with her boyfriend in a three-bedroom house, she had been in the relationship for only about six months. Prior to that, she had a history of frequent moves among the homes of her friends and relatives. Although at the time of the hearing, the mother was working at McDonald's, the evidence shows that she has been either unemployed or employed for only short periods of time since 1998. The special advocate reported on March 29, 2000, that she saw no stability in the mother's employment or environment. In our view, there was ample evidence from which the court could find that the conditions and causes of deprivation were likely to continue.

The mother also contends that the trial court improperly found that continued deprivation is likely to cause serious physical, mental, emotional, or moral harm to the children.[18] Here, the special advocate assigned to the case reported that when she met the children in 1998, they were "withdrawn and tantrum prone." She reported that since they were returned to foster care, "they are much happier and seem to be thriving in a normal manner for children their age" and there is very little evidence of their prior behavior. She reported that there was a true bond between the children and their foster parents

---

[16] *In the Interest of H. L. W.*, 229 Ga. App. 264, 267 (493 SE2d 637) (1997).

[17] See *In the Interest of C. P.*, 242 Ga. App. 698, 704 (3) (c) (531 SE2d 117) (2000) (repeated failure to comply with the goals in the case reunification plan may show that the cause of the deprivation is likely to continue).

[18] See OCGA § 15-11-94 (b) (4) (A) (iv).

and recommended that parental rights be terminated and, further, that the foster parents be given the opportunity to adopt the children. The psychologist treating the oldest child for anxiety and depression indicated that the child has a "high need for routine and consistency" in her life. The doctor recommended that the child be placed in a consistently stable home situation.

Because of the mother's alcohol abuse and employment and housing problems, she remains unable to provide a suitable home or demonstrate an ability to adequately care for her children. While the mother testified at the hearing that she would like to be given the opportunity to try again, she also expressed the belief that the foster placement of her children was a good idea and should be extended indefinitely. Despite the fact that the mother appears to have a true bond with her children and has maintained constant and frequent contact with them, "the juvenile court was authorized to consider the children's need for a stable home situation and the detrimental effects of prolonged foster care."[19] "Children need permanence of home and emotional stability or they are likely to suffer serious emotional problems."[20] The evidence sufficed on this factor as well.

Finally, the juvenile court was authorized to conclude that termination of parental rights was in the children's best interests. "The same factors which show the existence of parental misconduct or inability can also support a finding that termination of parental rights would be in the best interest of the child."[21]

*Judgment affirmed. Ruffin and Ellington, JJ., concur.*

DECIDED NOVEMBER 7, 2001.

*Peter D. Johnson*, for appellant.

*Thurbert E. Baker, Attorney General, Dennis R. Dunn, Deputy Attorney General, William C. Joy, Senior Assistant Attorney General, Shalen S. Nelson, Laura W. Hyman, Assistant Attorneys General, Glover & Blount, Gary A. Glover*, for appellee.

---

[19] (Citation omitted.) *In the Interest of M. L.*, 227 Ga. App. 114, 117 (2) (488 SE2d 702) (1997).

[20] (Citation omitted.) *In the Interest of J. O. L.*, 235 Ga. App. 856, 858 (510 SE2d 613) (1998).

[21] *In the Interest of R. M.*, 232 Ga. App. 727, 729 (503 SE2d 635) (1998).