A06A0068. IN THE INTEREST OF M. S. et al., children.
(630 SE2d 856)

ELLINGTON, Judge.

The father of three children, seven-year-old M. S., six-year-old Cha. S., and five-year-old Che. S., appeals from the order of the Juvenile Court of Paulding County terminating his parental rights.[1] The father contends he was denied due process of law and the assistance of counsel at all stages of the proceedings leading to the termination of his parental rights. He also contends the evidence was insufficient to warrant termination and that the court erred in placing the children with foster families instead of relatives. Finding no error, we affirm.

On appeal, we must determine whether, after reviewing the evidence in a light most favorable to the lower court's judgments, any rational trier of fact could have found by clear and convincing evidence that the natural parent's rights to custody have been lost. This Court neither weighs evidence nor determines the credibility of witnesses; rather, we defer to the trial court's fact-finding and affirm unless the appellate standard is not met.

(Citation and footnote omitted.) *In the Interest of C. R. G.*, 272 Ga. App. 161, 161-162 (611 SE2d 784) (2005).

The Georgia Code sets forth a two-step process to be used in termination of parental rights cases. First, the trial court determines "whether there is present clear and convincing evidence of parental

---

[1] The mother voluntarily surrendered her parental rights and is not a party to this appeal.

misconduct or inability." OCGA § 15-11-94 (a). Four factors must be present to establish parental misconduct or inability: (1) the child is deprived; (2) the lack of proper parental care or control by the parent in question causes the deprivation; (3) the cause of the deprivation is likely to continue; and (4) continued deprivation causes the child serious physical, mental, emotional, or moral harm. OCGA § 15-11-94 (b) (4) (A). If the trial court finds that these four factors exist, then the court determines whether termination of parental rights is in the best interest of the child, "after considering the physical, mental, emotional, and moral condition and needs of the child . . . , including the need for a secure and stable home." OCGA § 15-11-94 (a).

Viewed in the light most favorable to the juvenile court's judgment, the record shows that the Georgia Department of Human Resources by and through the Cobb County Department of Family and Children Services ("the Cobb DFCS") began an investigation on this family on June 4, 1999, when it received reports that M. S. had a skull fracture and that the father had substance abuse and anger management problems. In a petition, the Cobb DFCS complained that on April 14, 1999, the police responded to a domestic disturbance call where the father, while drunk, tore the door off the refrigerator, smashed the car windows, and shoved the mother into a wall while she was holding M. S. The Cobb DFCS placed M. S. in protective custody and filed a deprivation petition. On August 18, 1999, following a deprivation hearing, the juvenile court found that the father "is bipolar and has had difficulty" with his medication, and that the father "admitted that he has used marijuana in the past." The court returned M. S. to the family on the condition that the father attend drug treatment and domestic violence counseling, attend parenting classes, submit to random drug screens, and take his medication. The father, who was represented by counsel during these proceedings, did not appeal.

On May 10, 2001, the Paulding County Department of Family and Children Services ("the Department") brought a complaint alleging that on April 18, 2001, the father, while drunk and enraged, forced his wife, who was driving, to engage in a car chase while he and the children were in the car. The incident resulted in an accident. While at the hospital, medical and law enforcement personnel observed that the children were filthy, their car seats were soaked with urine, Cha. S. had suspicious bruises on her thighs, and Che. S. had severe diaper rash and sores. The father became irate and urinated on the hospital floor. The Paulding County Sheriff's Office arrested the father. Following a detention hearing, the court returned the children to the parents on the condition the father submit to an alcohol assessment and attend parenting classes. The father was

advised of his right to counsel at this hearing, but he waived that right. The father did not appeal this order.

On May 24, 2001, based on new allegations of neglect and abuse, the Department obtained temporary protective custody for the children and filed a deprivation petition. In its temporary custody order, the court recounted how, on May 23, 2001, M. S. suffered from a black eye, a knot on his forehead, and bruises on his face. The parents contended a bookcase fell on the child while he was left unattended. However, a doctor who examined M. S. opined that his wounds were inconsistent "with the mechanism of injury as explained by his parents." The court noted that the parents did not voluntarily seek medical attention for M. S. The mother also had a black eye and Cha. S. had bite marks on her arms. All three children were filthy. The record indicates the father was represented by counsel at the hearing. The father did not appeal the temporary custody order.

Pending an adjudicatory and dispositional hearing, the court assigned a Court Appointed Special Advocate ("CASA") to the case and appointed a guardian ad litem for the children. The CASA recommended the children remain in foster care. On August 6, 2001, following a visitation hearing at which the father testified, the court ordered that any further visitation between the father and his children be supervised. This was based upon an incident that occurred during visitation that required police intervention. The court ordered the father to complete an anger management course and submit to a drug screen before he resumed contact with his children. The order, which was served on the father's counsel of record, was not appealed.

On August 30, 2001, the Department submitted its case plan to the juvenile court. The plan required the father to maintain contact with the Department and to inform the Department within 48 hours of any change of address, telephone number or employment. The case plan also required the father to pay child support, maintain a relationship with the children, maintain stable housing and employment, resolve his outstanding criminal matters, remain drug and alcohol free, meet his mental health needs, complete an anger management program, submit to a psychological evaluation and counseling, and provide the names of any family members who might suffice as permanent placements for the children.

On November 28, 2001, the juvenile court conducted a deprivation hearing. The father was present at this hearing, but he did not have an attorney. The court advised the father of his right to counsel, and continued the deprivation hearing as to him until February 27, 2002. The court entered a consent order as to the mother, finding the children deprived. In its order, the court noted that the parents acknowledged that the Department had prepared a case plan that

provided alternate plans for either reunification or termination of parental rights. The court also described an incident that occurred outside the courtroom that day between the father and a caseworker who was attempting to schedule a meeting with the father. The father became so agitated during the contact that the caseworker had to walk away. The court noted the father's current address and directed the father to meet with the caseworker within 30 days of the entry of the order. The court's order was served upon the father's newly appointed counsel. The order was not appealed.

On February 27, 2002, the court conducted a deprivation hearing as to the father. The father's attorney appeared, but the father did not. The court noted that the father was given verbal and written notice of the hearing. The father's attorney testified that she made several efforts to meet with the father, who said he wanted to retain his own counsel. The attorney also testified she notified the father of the hearing, and tried to call him on the day of the hearing, but she only received a voice mail message from him stating that he "was nowhere that he could be found [that day]." The guardian ad litem, who met with the father a few days before the hearing, told the court that the meeting was the "most antagonistic, volatile meeting [she had] ever had in [her] life." Angry and cursing, the father had accused the guardian of being involved in a conspiracy and that he intended to use "triple and quadruple reverse psychology for the purpose of confusing her." The court allowed the father's attorney to withdraw from the case, and directed that all court papers and notices be sent to the father's last address of record. In the order, the court advised the father that he was responsible for managing his case unless he either objected to the order or until new counsel filed an appearance. Although neither the father nor his attorney was present, the court proceeded with the hearing as scheduled, finding that the father blatantly disregarded the court's orders. The court found the children deprived. The father did not object to or appeal from the court's order.

The record shows the father was arrested on February 21, 2002, for violating the terms and conditions of his probation. The father was on probation for criminal damage to property, and his probation was revoked for a new felony offense, aggravated battery against his wife. There is no evidence the father notified anyone he had been jailed. The Department, nevertheless, eventually located the father in jail and mailed him a copy of the proposed nonreunification plan on March 13, 2002. On April 4, 2002, the Department filed a motion seeking to extend custody of the children with the Department. The entry of service indicates the motion was served on the father at the Cobb County jail. Neither the father nor counsel on his behalf attended the hearing on April 24, 2002. The CASA submitted a written report at that time noting that the father had been sentenced

to three years in jail. On April 29, 2002, the court extended custody with the Department. On May 2, 2002, the court entered a supplemental order approving nonreunification as the permanent plan. In this order, the court overruled an objection to the plan that had been filed by the father in which the father stated: "I have never really been advised by a lawyer or represented by one in court and don't fully understand the context of the plan."

On May 12, 2003, the Department filed new deprivation petitions seeking continued custody of the children. The father was personally served, but did not attend the hearing because he was in jail. The court found the children deprived and continued custody with the Department. The father did not appeal the order. However, on August 19, 2003, and on April 28, 2004, the father filed objections to the case plan. In the August 19 objection, the father stated: "I have had no legal representation and am in prison and cannot afford an attorney." On May 21, 2004, the Department again moved the court to extend custody. The father was served with notice of the hearing, but did not attend because he was in jail. In its June 28, 2004 order, the court extended custody and approved adoption as the permanent plan. The father did not appeal the order or file an objection. The Department then filed a petition to terminate both the mother's and the father's parental rights. The father was personally served with the petition.

On July 19, 2004, the father filed a habeas corpus petition seeking to be transferred into the custody of the Paulding County Sheriff so that he could attend the termination hearing and contest the petition. The court denied the habeas petition but appointed counsel to represent the father.

On November 4, 2004, the juvenile court held a hearing on the Department's petition to terminate the father's parental rights. The father appeared and was represented by counsel. The mother appeared and voluntarily surrendered her parental rights to all three children. The prior shelter care orders, temporary custody and extension orders, deprivation orders, case plans and reports, and a variety of other related orders were entered into evidence without objection.

During the hearing, the father admitted he was in jail for violating his probation and for committing an aggravated battery against his wife and was not eligible for parole until June 2006. Although the father claimed he completed an anger management course, he had no certificate or documentary proof to submit to the court, as he previously had been ordered to produce. In fact, according to a caseworker, the father's behavior remained "hostile," "intimidating," and "scary." Further, the father provided no proof that he ever completed any psychological or drug and alcohol counseling, and he

refused to take a drug screen. The father failed to keep his appointments or seek employment prior to his incarceration. He never wrote to his children while he was in jail or made an effort to maintain a bond with them. One witness testified the father asked no questions about what he needed to do to be reunited with his children. He paid no child support, but accepted money from his family to retain an attorney to represent him in his divorce. The father explained that he hired the lawyer, saying: "I'm not just going to accept anything my wife throws at me, no." The father admitted he was unable to support his children while in prison and that his imprisonment negatively affected the children.

A caseworker testified that the children suffered from behavior problems. A psychologist opined that domestic violence had likely traumatized the children. Another psychologist diagnosed Cha. S. with oppositional defiant disorder, learning disabilities, and aggressive behavior. Cha. S. had episodes of bed wetting. Her foster mother testified that Cha. S. required medication and therapy, but was improving. Che. S.'s foster mother testified that the child had been with her for three years, and that the child required medication and therapy, but was adjusting well and had bonded with them. M. S., the oldest of the children, was very aggressive, sometimes violent, and had even attempted suicide. Despite his problems, M. S. had bonded with his foster parents and called them "mommy" and "daddy." M. S. told his foster mother that his father physically abused him. The foster parents of all three children expressed an interest in adopting them.

Early in their investigation, the Department considered placing the children with relatives, but were unable to locate a suitable family member. Neither the father nor the children's paternal grandfather suggested suitable placements. Moreover, of the father's available relatives, some were in denial about his violent tendencies and others were afraid of him. The children's paternal aunt, whose own child had died, initially expressed interest in adopting Cha. S. However, when she failed to follow up with the home evaluation or to participate in the children's lives, the Department closed its file on her.

1. In two related enumerations of error, the father complains that he was denied due process of law in the termination proceeding because he was not present at the deprivation hearings and was not represented by counsel at all stages of the process leading to the termination of his parental rights.

Our review of the record reveals that the father was approved for and received court-appointed counsel by July 1, 2001, shortly after his children were taken into protective custody. The record shows that during the pendency of this matter, the father was represented

by four different attorneys. The last of these attorneys represented the father at the termination hearing on November 4, 2004. The father was present at this hearing and testified. The father, however, was absent from the deprivation hearing held on February 27, 2002. When the father's attorney withdrew at the beginning of this hearing, the father was without counsel until September 1, 2004. The record shows that during this period, the father did not attend the "permanency nonreunification hearing as to the mother" held on September 12, 2002, the hearing on the paternal grandfather's motion to intervene held on April 21, 2004, the May 21, 2003, deprivation hearing, or the June 9, 2004, hearing to extend custody of children. Although the father also complains that he was not present for the motion "to Extend Juvenile Court Order and the Termination of Parental Rights hearing as to the mother," the record does not show that any hearing was held on this matter. The record shows that the father was jailed on February 21, 2002, following the probation revocation and was unable to attend any of these proceedings without a production order. Although the father had a divorce attorney and a criminal attorney representing him at various times during his incarceration, there is no evidence in the record that either was retained to assist him in this case. It was not until the father filed a habeas corpus petition, which the court deemed an effort by the father "to be produced for the trial of the Department's Motion for Termination of Parental rights," the court appointed the father his fourth attorney "to alleviate some of these issues."

The father, who was found to be indigent, was entitled to counsel throughout the proceedings. The right is established by statute, which provides in part that,

> [e]xcept as otherwise provided under this article, a party is entitled to representation by legal counsel at all stages of any proceedings alleging . . . deprivation and if, as an indigent person, a party is unable to employ counsel, he or she is entitled to have the court provide counsel for him or her. If a party appears without counsel, the court shall ascertain whether such party knows of his or her right to counsel and to be provided with counsel by the court if he or she is an indigent person. The court may continue the proceeding to enable a party to obtain counsel and shall provide counsel for an unrepresented indigent person upon the request of such a person.

OCGA § 15-11-6 (b). The father, as a parent, is a party to all proceedings involving his children. *In the Interest of A. J.*, 269 Ga. App. 580, 581-582 (1) (604 SE2d 635) (2004). Although there is some evidence

to support an inference that the father intended to proceed pro se and had waived his right to counsel through his conduct on February 27, 2002, we are concerned that the court failed to make further inquiry into the matter,[2] especially when just a few months later the father complained from jail that he had no attorney. However, as we have held, a termination proceeding

> is not the proper time to assert error in the deprivation proceedings. Deprivation proceedings and parental rights termination proceedings are separate and distinct. Unappealed deprivation orders of the juvenile court may be used to establish that the children were deprived within the meaning of OCGA § 15-11-94 (b) (4) (A) (i). Because the parents did not appeal that decision regarding their children, they are bound by the determination that their children were deprived. Accordingly, the parents' enumerations of error concerning the denial of counsel at the deprivation hearing are not properly before us in this appeal.

(Citations omitted.) *In the Interest of C. M.*, 258 Ga. App. 387, 387-388 (1) (574 SE2d 433) (2002). See also *In the Interest of I. S.*, 278 Ga. 859, 861, n. 6 (607 SE2d 546) (2005) (accord). Moreover, pretermitting whether any due process violation occurred, the father has failed to show how he was harmed as a result of the alleged violation. *In the Interest of C. B.*, 258 Ga. App. 143, 147-148 (3) (574 SE2d 339) (2002) ("Because [termination] is a civil matter not involving a state or federal constitutional right to counsel, the father is required to show harm as well as error to warrant reversal.") (footnotes omitted). Beyond his bare claim that he was denied counsel, he failed to show what arguments he would have advanced, what evidence he would have produced in his favor, or how he would have been successful had

---

[2] As we have held:

The fundamental idea of due process is notice and an opportunity to be heard. The Code recognizes that the parent is a "party" to proceedings involving his child. As parties to a deprivation hearing, parents are entitled to notice and an adequate opportunity to be heard. We have also held that due process is not offended by the failure to secure the presence of an in-state prisoner at a deprivation hearing where the prisoner nonetheless was represented by counsel. However, a due process violation is unavoidable where . . . there has been no opportunity to be heard. Moreover, because a parent's right to counsel in such proceedings is threatened by the failure to follow the notice and hearing requirements in the Juvenile Code, our Supreme Court has held them mandatory, subject to waiver.

(Citations, punctuation and emphasis omitted.) *In the Interest of A. J.*, 269 Ga. App. at 581-582 (1).

he been represented by counsel. Moreover, in light of the overwhelming evidence supporting the termination of his parental rights, see Division 2, infra, we find nothing in the record that would support a finding of harm.

2. The evidence adduced during the termination hearing was sufficient under the "clear and convincing" evidentiary standard to support the termination of the father's parental rights. The Department showed that, despite years of intervention from it and from the police, the father utterly failed to manage his anger, control his alcohol and substance abuse, and demonstrate any insight into his mental health problems. He abused his wife, which resulted in his incarceration on aggravated battery charges. He abused and neglected his children, leaving them physically and psychologically damaged and requiring therapy and medication. There is very little evidence that during the pendency of this case the father made any effort to support his children emotionally or financially or to cooperate with the Department in meeting the goals of his case plan.

The evidence supports the court's finding that the children are deprived. And given the father's past conduct and his present incarceration, the children will likely continue to be deprived. The court was authorized to consider the father's imprisonment, which had a demonstrable negative effect on the quality of his relationship with the children. *In the Interest of T. M. R.*, 217 Ga. App. 461, 462 (458 SE2d 148) (1995). The testimony of the children's foster parents, the caseworkers, the guardian ad litem, and the CASA all support the court's finding that the children have suffered and will likely continue to suffer serious physical, mental, emotional, or moral harm if the deprivation is allowed to continue. The evidence clearly and convincingly supports the court's finding of parental misconduct and inability under OCGA § 15-11-94 (b) (4) (A) (i) through (iv).

The court also found that termination of parental rights was in the best interests of the children, "after considering the physical, mental, emotional, and moral condition and needs of the child, including the need for a secure and stable home," as required by OCGA § 15-11-94 (a). "The same factors which show the existence of parental misconduct or inability can also support a finding that termination of parental rights would be in the best interest of the child." *In the Interest of R. M.*, 232 Ga. App. 727, 729 (503 SE2d 635) (1998). Further, the children, who have been in foster care for more than four years, deserve stability in their lives, a factor the court considered. *In the Interest of N. M. H.*, 252 Ga. App. 353, 358 (556 SE2d 454) (2001). Although the father claims he will soon be released from prison and is now willing to take steps to be a proper parent, judging the credibility of his claims was for the juvenile court. Id. at 356-357. The evidence shows the children have been doing well in the

care of their foster parents, all of whom expressed interest in adoption. The evidence adduced clearly and convincingly supports the trial court's finding that termination of his parental rights was in the best interests of the children. See id. at 357-358. For these reasons, we find no error in the trial court's order terminating the father's parental rights to these children.

3. Finally, the father contends the juvenile court abused its discretion by failing to place the children with a family member. "A trial court's determination that placement with a relative is not in the best interest of the child will not be disturbed by this Court absent an abuse of discretion." (Citation omitted.) *In the Interest of S. H.*, 251 Ga. App. 555, 559 (2) (553 SE2d 849) (2001). The record reveals that the Department investigated several family members as placements and performed a "First Placement/Best Placement" assessment. The court also considered five family members, but found them all unsuitable. Each of the family members considered was either unwilling to provide care for the children or was unable to protect the children from continued abuse by their father. Given the evidence adduced, we cannot say the court abused its discretion in this regard. Id.

*Judgment affirmed. Johnson, P. J., and Miller, J., concur.*

DECIDED MAY 9, 2006.

*Mark Hong Chol Yun*, for appellant.

*Thurbert E. Baker, Attorney General, Shalen S. Nelson, Senior Assistant Attorney General, Joseph T. Justice, Patricia K. Buonodono*, for appellee.