560 S.E.2d 318 (2002)
253 Ga. App. 732
In the Interest of J.P. et al., children (Two Cases).
Nos. A01A1639, A01A1640.
Court of Appeals of Georgia.
February 14, 2002.
*319 Michael R. McCarthy, Dalton, for appellant.
Thurbert E. Baker, Atty. Gen., Dennis R. Dunn, Deputy Atty. Gen., William C. Joy, Senior Asst. Atty. Gen., Shalen S. Nelson, Asst. Atty. Gen., Richard K. Murray, Dalton, for appellees.
POPE, Presiding Judge.
The mother of J.P. and R.M. appeals the juvenile court's order of deprivation as to the two children. She also appeals the subsequent order granting a motion for nonreunification as to J.P. filed by the Department of Family & Children Services and a motion for nonreunification as to R.M. filed by the child's guardian ad litem. We affirm.
Case No. A01A1639
In the mother's appeal from the trial court's order of deprivation, we review the evidence from the juvenile court hearings in the light most favorable to the court's judgment *320 and determine whether any rational trier of fact could have found by clear and convincing evidence that the children were deprived. In the Interest of B.M.B., 241 Ga.App. 609, 527 S.E.2d 250 (1999).
The evidence at the deprivation hearing showed that DFACS began an investigation of this family on or about August 22, 2000, after receiving a referral from the Federal Bureau of Investigation concerning videotapes involving children. An FBI agent testified that Canadian authorities had recovered a videotape showing the children's adoptive father spanking young children and relayed information about the tape to the FBI. The FBI obtained a search warrant for the family home, and agents seized over 200 videotapes and eight-millimeter tapes, numerous e-mail messages related to the spanking videos, four to five wooden paddles and a pair of handcuffs. A printed copy of one of the e-mail messages requesting a spanking videotape was found in a dresser drawer that was used by both parents.
The children's father admitted to police that he produced videos that showed him spanking children and exchanged them with other parents. He admitted to investigators that he became sexually aroused watching children get spanked, but could not become aroused when watching his own children being spanked. Therefore, he exchanged videos with other parents.
Two tapes were shown at the deprivation hearing, and the FBI agent identified the participants. One of the scenes in the videos showed the mother spanking J.P. Others showed the father spanking his own biological children as well as J.P., at times removing articles of clothing to do so and at times quoting scripture or stating that the spankings were God's will. The agent testified that many of the spanking scenes appeared scripted, with the adults appearing to manufacture a reason to spank the children. And if the children moved out of camera range during filming, they were instructed to move back in front of the camera.
During one scene, the mother ordered J.P. to stand in a certain position, and when J.P. moved, she repositioned the child in front of the camera. The mother's voice is also heard in the background of another scene. The FBI agent also described a scene in which J.P. and another child were acting out sexually.
There was also evidence that the mother had been present when the father met with a man from Alabama, with whom the father exchanged spanking videos. She later told a DFACS caseworker that the man may have been involved with the videotapes.
One of the father's co-workers testified at the deprivation hearing about an earlier incident in January 2000 when what he described as a "disturbing" video and a package containing female underwear were discovered in the father's desk at work. The father's employer confronted the parents about his discovery and advised the father to get counseling. He also directed the father to close the mailbox to which the package containing the underwear had been sent. The tape was later turned over to a postal inspector and law enforcement.
A sexual assault nurse examiner testified that she had examined J.P. and discovered some scarring on her hymen, which she asked a doctor to confirm. The nurse could not state how or when the scarring occurred. She also stated that J.P. exhibited no signs of embarrassment when she asked the child to remove her clothing, which the nurse found to be unlike most children. J.P. told the nurse during the examination that she had been undressed and spanked.
The DFACS caseworker assigned to the case testified that he viewed the videotapes and was able to identify the father, the mother and several of the children on the tapes because he had conducted prior investigations concerning the family. Upon seeing the tapes, the caseworker sought emergency custody of all five children in the home, including J.P. and R.M. When he met with the mother, she denied knowing about the videotapes or knowing that she had ever been videotaped spanking the children. But the mother later admitted to police that she was aware of the earlier incident at the father's employer and that her husband had sought counseling.
*321 The children's maternal grandmother testified that she and her husband could provide J.P. and R.M. a home with them in Arizona. In fact, R.M. had lived with them until the child was five or six years old and had also spent the previous summer with them. The grandmother stated that she had been unaware of any problems until the mother called her two weeks before the hearing. She acknowledged that the children would probably need intensive emotional therapy and that she and her husband were prepared to do whatever they needed to help the children.
At the close of the evidence, the children's guardian ad litem recommended that they be placed in DFACS's temporary custody. The juvenile court subsequently entered a finding of deprivation and ordered that the children be placed in DFACS's custody. The juvenile court later amended this order, granting the maternal grandparents' motion to intervene and placing R.M. in their temporary custody.
Under Georgia law, a deprived child is one who "[i]s without proper parental care or control, subsistence, education as required by law, or other care or control necessary for the child's physical, mental, or emotional health or morals." OCGA § 15-11-2(8)(A). And Georgia courts have held that this definition does not require a finding of parental fault: "This definition focuses upon the needs of the child regardless of parental fault. The deprivation petition is brought on behalf of the child and it is the child's welfare and not who is responsible for the conditions which amount to deprivation that is the issue." (Punctuation and footnote omitted.) In the Interest of C.C., 249 Ga.App. 101, 103, 547 S.E.2d 738 (2001). Therefore, deprivation is established by proof of parental unfitness arising from "either intentional or unintentional misconduct resulting in the abuse or neglect of the child or by what is tantamount to physical or mental incapability to care for the child." (Citation and punctuation omitted.) In the Interest of W.P.H., 249 Ga.App. 890, 891(1), 549 S.E.2d 513 (2001).
In determining that the children were deprived, the juvenile court found that the father's actions as to J.P. in particular were inappropriate, that the spankings and videotaping involved emotional and mental abuse of the children, including J.P., and that the mother was aware of and/or participated in these actions. Based upon our review of the record, we find that there was clear and convincing evidence to support the trial court's findings in support of the order concluding that the children were deprived.
Case No. A01A1640
On the mother's appeal from the order approving the plans for nonreunification, we "neither weigh[] the evidence nor determine[] the credibility of witnesses; we defer to the juvenile court's factfinding and affirm unless the appellate standard is not met. [Cit.]" In the Interest of R.U., 239 Ga.App. 573, 577(1), 521 S.E.2d 610 (1999). Thus, we must determine if there was sufficient clear and convincing evidence to support the juvenile court's determination that reunification services should not be provided. Id.; OCGA § 15-11-58(h).
The parties stipulated that the transcript from the deprivation hearing would serve as original evidence at the hearing on the motions for nonreunification. In addition, a clinical psychologist was qualified as an expert in the field of child psychology. Although the psychologist did not personally examine J.P. or R.M., he reviewed the allegations and history of the case and interviewed one of the father's biological children who was also seen being spanked on the videotapes. He opined that the conduct inflicted upon the children involved was "severely abusive" and "egregious," constituting physical, mental and emotional neglect. He found the parents' conduct to be both physically and emotionally abusive in nature.
The DFACS social services case manager for J.P.'s case testified that the department was recommending a nonreunification plan with regard to J.P. DFACS made this recommendation despite the fact that the mother was cooperating with the department in seeking a psychological evaluation and nurturing training due to the severity of the abuse involved. But DFACS was not planning at the time of the hearing to seek a termination of parental rights against the mother.
*322 After being advised of her constitutional right against self-incrimination, the mother chose to testify in opposition to the plans of nonreunification. At the time of the hearing, the mother was seeking a divorce from the father and had been cooperating with law enforcement in their case against the father by producing additional evidence she discovered. She stated that she knew nothing about the videotaping, even though she is seen spanking J.P. in one of the scenes on the tapes and watching the father spank J.P. in another. She said that the tapes were made before her marriage to the father. She claimed she first learned that her husband was involved with child pornography at the time of his arrest.
She stated that she was aware of the tape found in her husband's desk at work, but all she knew was that the tape showed children being spanked. She said that she was unaware of any sexual overtones, although she admitted that the father's employer told her the tapes were not "decent." She never viewed the tape or inquired whether her children were on it, although she assumed that J.P. was on the tape because the father had spanked her. The father told her that he had made the tape to protect himself from a charge of abuse because he had had problems with DFACS before.
Nevertheless, she was aware that her husband was seeking pastoral counseling as a result of the tape's discovery and even attended one of the sessions. The mother admitted that her voice was heard in the background on one of the tapes in a scene where J.P. was massaging her genital area. She admitted that the paddles, e-mails and tapes were found in common areas in her home and that she was aware of at least some of the paddles. She also admitted that the tapes showed physical abuse of the children, that the children were emotionally abused and that one scene between the father and J.P. bordered on sexual molestation.
In addition, the parties consented to the admission of an affidavit by the father's employer. The employer stated that he told the mother that he considered the father's actions to be "a sick immoral perversion and that if she was not willing to help [the father] overcome this that she should take her children and leave." He also informed the mother about the mailboxes the father was using to receive materials and instructed her to see that they were closed. He also told her that she should attend the counseling sessions with her husband and get the children counseling if necessary. He stated that there was no doubt in his mind that when the mother left his office, she was aware that the father "had been involved in sexual perversion with her children."
The mother asserts that this evidence was insufficient to support the plans for nonreunification because the child psychology expert who testified did not interview the children involved, but rather relied upon conclusions reached by a nontestifying expert who had evaluated the children. She asserts that this rendered the expert's testimony inadmissible hearsay.
But there is nothing in the record to indicate that the expert relied upon anyone else's expert evaluations. Rather, he testified that he reviewed a history of the allegations in the case and the juvenile court's prior order. He also reviewed the facts and history and treatment of the child on whom he had personally conducted a psychological evaluation. And although he relied in part upon documentary evidence prepared by others, under Georgia law, it is well settled that an expert may rely on hearsay as well as reports of others in formulating his opinions. See King v. Browning, 246 Ga. 46, 47(1), 268 S.E.2d 653 (1980). "The lack of personal knowledge on the part of the expert does not mandate the exclusion of the opinion but, rather, presents a [fact] question as to the weight which should be assigned the opinion." (Citations and punctuation omitted.) In the Interest of D.S.R., 246 Ga.App. 426, 428(3), 541 S.E.2d 61 (2000). Accordingly, there was no error in the trial court's admission of the expert's testimony, particularly in light of the mother's failure to object thereto.
Under OCGA § 15-11-58(h), in order to approve the recommendations of nonreunification, a juvenile court must determine "by clear and convincing evidence whether reasonable *323 efforts to reunify a child with his or her family will be detrimental to the child and that reunification services, therefore, should not be provided...." The statute establishes a presumption that reunification should not be provided where there is clear and convincing evidence that any of the grounds for the termination of parental rights exist. OCGA § 15-11-58(h)(3). Such a presumption also exists if there is clear and convincing evidence that any of the circumstances set out in OCGA § 15-11-58(a)(4) exist. OCGA § 15-11-58(h)(4). Subsection (a)(4) addresses instances where the parent has subjected the child to aggravated circumstances, including, but not limited to, chronic abuse and sexual abuse.
Here, it was undisputed that J.P., as well as other children in the home, was submitted to repeated physical and emotional abuse. The mother herself admits that the children were subjected to such abuse in her home and that her husband's actions with regard to J.P. bordered on sexual abuse. The child care professionals who interviewed the children and reviewed the family history and the tapes characterize this abuse as severe and egregious. The actions of the parents involved in making these videotapes are compounded by the fact that the father exchanged them with other adults for pornographic purposes.
Although the mother denies knowing about the videotaping or the exchange of pornography, she is seen on the tapes participating in the spankings and heard in the background while someone tapes her young child engaging in sexually suggestive behavior. In addition, the evidence showed that the father's employer informed the mother of the sexually perverse nature of the videotape discovered in the father's desk. He said that she unquestionably understood that the tapes involved improper actions with her own children. And even though she assumed that J.P. appeared on a tape that upset the father's employer and necessitated pastoral counseling, she never viewed the tape nor made further inquiry of anyone other than the father as to the actions taken toward her children. Instead, she kept her children in the home with the father for eight months until his arrest for child pornography, subjecting them to more potential abuse in the interim.
We find, therefore, that there was clear and convincing evidence that the mother was either aware of these matters involving her children or simply chose to ignore them. Either way, we find that the mother subjected her children to aggravated circumstances involving admittedly physical and emotional abuse, if not sexual abuse. And the fact that there was no direct evidence of abuse against R.M. does not compel a different conclusion in that child's case. The evidence showed that the abuse involved J.P., as well as the father's biological children, who all lived in the same home. This evidence was sufficient to show that reunification between R.M. and his mother would be detrimental. "Egregious conduct or evidence of past egregious conduct of the parent toward the child or toward another child of a physically, emotionally, or sexually cruel or abusive nature" is one factor a court may consider in determining whether a child is without proper parental care and control. OCGA § 15-11-94(b)(4)(B)(iv). See generally In the Interest of J.M.S.M., 240 Ga.App. 294, 296, 523 S.E.2d 357 (1999); In the Interest of C.J.V., 236 Ga.App. 770, 775, 513 S.E.2d 513 (1999).
Therefore, a presumption against nonreunification existed and there was insufficient evidence to overcome that presumption. OCGA § 15-11-58(a)(4)(A), (h)(4). Thus, the juvenile court could properly conclude that reunification would be detrimental to these children and properly granted the motions of DFACS and the guardian ad litem to pursue plans for nonreunification as to each child.
Judgments affirmed.
BLACKBURN, C.J., and MIKELL, J., concur.