A06A1092. IN THE INTEREST OF J. A. W., a child.
(636 SE2d 725)

JOHNSON, Presiding Judge.

The Floyd County Juvenile Court terminated the parental rights of the mother of J. A. W. The mother appeals, asserting that the evidence is insufficient to support the court's finding that the child's deprivation is likely to continue. We agree with the mother, and reverse the juvenile court's order terminating her parental rights.

At the outset of the termination hearing, the mother's attorney sought a continuance so that he could contact the mother, who was not present in court but was in a Florida prison serving a four-year sentence for vehicular homicide. The court denied the request for a continuance because the mother had been notified in prison about the hearing.

The department then presented the testimony of two witnesses. First, J. A. W.'s foster mother testified that the child was twenty months old and had lived with her and her husband for almost three months. She further testified that J. A. W. is developing well, that she has had no contact with his biological mother, and that she and her husband are interested in adopting him.

The department's other witness was one of its caseworkers. The caseworker testified that the mother, who is 22 years old, had a career in the United States Army prior to her vehicular homicide conviction. Before reporting to serve her prison sentence, the mother was allowed to attempt to locate J. A. W.'s father. But she was unable to find the father, so she came to Floyd County where her own mother lives. The mother gave birth to J. A. W. on April 30, 2003, and subsequently gave custody of the child to the maternal grandmother.

The mother began serving her four-year sentence on July 28, 2003, and is scheduled for release in 2007. After the mother began serving her sentence, the maternal grandmother declined to care for J. A. W., and turned the child over to the custody of the department. J. A. W.'s mother has spoken with the caseworker numerous times about relatives with whom the child might be placed until the mother is released from prison. The mother has tried to contact several relatives in Florida and Georgia, and she has provided the caseworker with relatives' names and phone numbers. But none of the relatives has been willing to care for the child.

The caseworker testified that the mother often calls to ask what she can do on her case, and the mother has not failed to follow through with any of the caseworker's suggestions. While incarcerated, the mother has completed four parenting classes and has undergone counseling. She has also crocheted presents for J. A. W., including a blanket and a teddy bear.

But, according to the caseworker, the mother has not complied with the department's case plan requirement that she write to J. A. W. once a week. Instead, she has written letters to the department about every other week, although the caseworker had not received a letter for a couple of months. In the letters, the mother asks how J. A. W. is doing and asks that her child be told that she loves him and cares about him.

The caseworker testified that the only factor that makes the mother unable to parent J. A. W. is her incarceration. She has no criminal record other than the vehicular homicide for which she is now incarcerated, and the department is not aware of any physical or mental problems that would render her incapable of being a parent. Nevertheless, according to the caseworker, the department is seeking to terminate the mother's parental rights because J. A. W. will be four-and-a-half when his mother is released from prison, he does not have a bond with her and he needs a stable home.

After the caseworker's testimony, the department rested, while the mother's attorney presented no evidence on her behalf. The juvenile court judge then expressed concern about terminating the mother's parental rights without some expert testimony concerning the effect of the mother's incarceration on the child. The department's attorney stated that she could depose an expert witness. The judge, who had denied the request for a continuance by the mother's attorney at the start of the hearing, then granted a continuance of 49 days so the department could depose an expert and supplement its evidence.

The department subsequently supplemented its evidence with the deposition of a psychologist. He testified that he has never worked with J. A. W. and has never met the mother. But in answering hypothetical questions, he opined that children who do not have a permanent attachment to a parent and a stable home will become depressed, anxious, experience eating and sleep disorders and have difficulty relating to peers. He further testified that removing a child from a foster home after four years and returning him to his biological mother would cause trauma and psychological problems for the child because he will be attached to the foster parents and have no affiliation with the mother.

On cross-examination, the psychologist testified that based on the mother's conduct in prison it appears that she is a motivated

parent and wants to learn to be a good parent. He also testified that it would not be detrimental to the child if the mother sends gifts and letters to him and maintains contact with him from prison. Although the psychologist claimed that returning a child in J. A. W.'s circumstances to the mother would cause him problems, he testified that it is possible to reintroduce a parent to a child.

In order to terminate parental rights, the court must first determine that there is present clear and convincing evidence of parental misconduct or inability.[1] The court determines parental misconduct or inability by finding that (1) the child is deprived, (2) the lack of parental care or control is the cause of the deprivation, (3) the cause of the deprivation is likely to continue or will not be remedied, and (4) the continued deprivation will cause or is likely to cause serious physical, mental, emotional or moral harm to the child.[2]

In the instant case, the juvenile court correctly found clear and convincing evidence that J. A. W. is deprived due to his mother's incarceration. But contrary to the finding of the juvenile court, there is not clear and convincing evidence that the cause of the deprivation is likely to continue and will not be remedied. "Imprisonment alone does not automatically authorize a termination of parental rights premised upon parental unfitness; there must be circumstances in aggravation."[3] One circumstance that may be considered in aggravation is whether the imprisoned parent has made an effort to communicate with the child and maintain a parental bond.[4]

While the mother did not write letters directly to J. A. W., we note that at the time of the termination hearing he was only 20 months old and there is no evidence concerning the ability of such a young child to understand the concept of a letter. Moreover, this is not a case in which the mother made no effort to communicate with her child or maintain a parental bond. According to the department caseworker, the mother regularly wrote letters in which she inquired about J. A. W. and asked that he be told that she loves him and cares about him. She made presents for him and completed parenting classes in prison. The department's own expert testified that she appears to be a motivated parent.

And while we are mindful that a juvenile court is authorized to consider the length of a parent's incarceration and thus the length of the child's stay in foster care before reunification, this case is materially different from those in which the incarceration is longer and the

---

[1] OCGA § 15-11-94 (a).

[2] OCGA § 15-11-94 (b) (4) (A).

[3] (Citations omitted.) *In the Interest of R. A.*, 226 Ga. App. 18, 20 (486 SE2d 363) (1997).

[4] *In the Interest of J. D. F.*, 277 Ga. App. 424, 427 (1) (626 SE2d 616) (2006).

children are older.[5] There is, of course, no bright-line rule about the length of incarceration or the age of the child which determines whether or not termination is appropriate. But under the circumstances of the instant case, the young age of the child cannot be ignored in assessing the sufficiency of the evidence supporting termination.

"Termination of parental rights is a remedy of last resort that cannot be sustained where there is no clear and convincing evidence that the cause of the deprivation is likely to continue."[6] Here, as the department's caseworker testified, there is no evidence of parental unfitness other than the mother's current incarceration. The mother served in the U. S. Army prior to her imprisonment for vehicular homicide, she has no other criminal record, she tried diligently to find a family member to care for her child until her release, there is no evidence of any physical or mental deficiency that renders her unable to be a parent, she is motivated to be a good parent and she has undergone the recommended counseling and parenting classes. We conclude that there is not clear and convincing evidence at this time that the cause of the deprivation is likely to continue and will not be remedied. Termination of the mother's parental rights was therefore erroneous and must be reversed.

*Judgment reversed. Miller and Ellington, JJ., concur.*

DECIDED SEPTEMBER 13, 2006.

*Steven V. Bennett,* for appellant.
*Thurbert E. Baker, Attorney General, Shalen S. Nelson, Senior Assistant Attorney General, Virginia B. Fuller, Assistant Attorney General, Holly A. Bradfield,* for appellee.

---

[5] Compare *In the Interest of D. M. W.,* 266 Ga. App. 456, 460 (3) (597 SE2d 531) (2004) (mother was incarcerated when the child was six months old and would be twelve years old upon her release); *In the Interest of A. T. H.,* 248 Ga. App. 570, 573 (1) (547 SE2d 299) (2001) (mother serving two life sentences and not eligible for parole until her two children, who have already been in foster care for most of their lives, will be fourteen and fifteen years old).

[6] (Punctuation and footnote omitted.) *In the Interest of J. D. F.,* supra at 429 (1).