A06A1815. IN THE INTEREST OF D. T., a child.
(643 SE2d 842)

BARNES, Chief Judge.

The mother of 15-year-old D. T. appeals from the order of the Juvenile Court of Cherokee County finding her son deprived. The juvenile court found that the parents were unable to provide for the special mental health needs of the child and that returning him to the house would be contrary to D. T.'s welfare. The mother contends on appeal that there was no evidence of deprivation, the proceeding was a pretextual custody battle, and the trial court should have dismissed the petition because the Department of Family and Children Services (DFACS) did not follow statutory procedures of review and assistance, causing a four-month delay in the adjudicatory hearing. Finding no error, we affirm.

In reviewing a juvenile court's finding of deprivation,

[w]e review [the evidence] in the light most favorable to the juvenile court's judgment to determine whether any rational trier of fact could have found by clear and convincing evidence that the child was deprived. This Court neither weighs

evidence nor determines the credibility of witnesses; rather, we defer to the trial court's fact-finding and affirm unless the appellate standard is not met.

(Citation and punctuation omitted.) *In the Interest of B. M. B.*, 241 Ga. App. 609 (527 SE2d 250) (1999).

So viewed, the evidence shows that on March 24, 2005, DFACS filed a nonemergency petition of deprivation on behalf of D. T. and his two siblings. The petition alleged that the mother had used inappropriate discipline on one of the children, that the contested divorce had caused "emotional harm to the children, especially [D. T.] who is diagnosed as bipolar," and that the mother refused help from DFACS. The police had been called to the residence 14 times in 2005 because of domestic disputes involving D. T. An order for shelter care for D. T. was filed on March 31, 2005, and the other children remained in the custody of the mother.

DFACS had first become involved with the family in September 2004 when it filed a nonemergency petition on behalf of D. T. and subsequently placed the child with his paternal grandmother under a safety plan because his mother, who had custody, was unable to control the child due to D. T.'s severe mental problems. There was a safety plan in place, the petition was dismissed and at some point, D. T. returned to the mother's home. The record reflects that there were six referrals involving D. T. from February 2003 until March 2005. Many of the allegations had to do with D. T.'s unruly behavior and allegations of verbal and physical threats. Police were called to D. T.'s mother's home 44 times from November 2003 to March 2005.

At the deprivation hearing, the mother testified that "[D. T.] is a very difficult child. He has been since he was very young. When he was four years old, he was diagnosed . . . with an emotional disorder . . . [and] he was kicked out of three preschools." She also testified that he has ADHD, an oppositional defiance disorder, and is bipolar. D. T. has been on approximately 38 medications in his lifetime and is currently taking Risperdal, an anti-psychotic, Depakote, which is a mood stabilizer, and Adderall for his ADHD. The mother testified that when D. T. has an "episode" she sends him outside to cool off or she leaves with the other two boys. His brothers are afraid of D. T., who is six foot five or six and weighs 270 pounds, when he is having a bad episode. The mother expressed that D. T. has always been aggressive, and that she is concerned for anyone, including his brothers, who might be around when D. T. is not on his medication.

A clinical child specialist who interviewed D. T. testified that D. T. said that he hated living with his mother and that she frequently "used the police against him." She said that D. T. reported that his mother called the police about 15 times on him for a variety of

incidents including "not washing the dishes." She also testified that D. T. said that he and his mother had altercations several times a week and that she had once threatened him with a steak knife. She said that D. T. told her that he was restricted to bread and water or locked out of the house as punishment.

A clinical social worker who conducted a family assessment testified that the parents' divorce was having a negative impact on the children. D. T. needed consistency and stability because of his mental health issues, and the parents blamed each other for D. T.'s behavioral problems and disagreed about his diagnosis. She testified that the contentious divorce made it difficult to clearly assess the family, but that she was concerned that the mother was unable to meet D. T.'s needs. The social worker recommended that D. T. remain with the paternal grandmother or if his behavior became unmanageable that he be put in a therapeutic placement, that D. T. continue therapy, and that the parents receive psychological evaluations and parenting classes.

A licensed psychologist who evaluated D. T. testified that the boy might have ADHD, there was a good possibility that he had oppositional defiant disorder, and there was a slim chance that D. T. was bipolar. He felt that some of the testing revealed an unconscious rejection of the mother and that D. T. had some issues, both passively and actively, with her. He testified that D. T. felt that his mother wanted him locked up, and that she and her boyfriend had lied to have him locked up at the Regional Youth Detention Center. The doctor recommended that D. T. receive more psychiatric treatment before he is reunited with his mother, and that it would be premature to place D. T. back in the home at this point.

1. The mother first contends that there was no clear and convincing evidence that D. T. is deprived within the meaning of OCGA § 15-11-2 (8). We do not agree.

Pursuant to OCGA § 15-11-2 (8) (A), a deprived child is one who "[i]s without proper parental care or control, subsistence, education as required by law, or other care or control necessary for [his] physical, mental, or emotional health or morals." This definition "focuses upon the needs of the child regardless of parental fault. The [deprivation] petition is brought on behalf of the child and it is the child's welfare and not who is responsible for the conditions which amount to deprivation that is the issue." (Citations, punctuation and emphasis omitted.) *In the Interest of D. E. K.*, 236 Ga. App. 574, 577 (512 SE2d 690) (1999). Deprivation must be shown by clear and convincing evidence. Id.

This standard of review safeguards the high value society places on the integrity of the family unit and helps eliminate

the risk that a factfinder might base his determination on a few isolated instances of unusual conduct or idiosyncratic behavior. Only under compelling circumstances found to exist by clear and convincing proof may a court sever the parent-child custodial relationship.

(Footnote omitted.) *In the Interest of S. J.*, 270 Ga. App. 598, 599 (607 SE2d 225) (2004). "The juvenile court's primary responsibility is to consider and protect the welfare of [a child] whose well-being is threatened. OCGA § 15-11-1 (1)." *In the Interest of B. H.*, 190 Ga. App. 131, 133 (1) (378 SE2d 175) (1989). The primary factor in a determination of deprivation is the child's need, not the parents' circumstances. *In the Interest of R. M.*, 276 Ga. App. 707, 715 (624 SE2d 182) (2005). The special medical needs of a child and the parents' inability to provide for those needs are relevant considerations. *In the Interest of J. C. J.*, 207 Ga. App. 599, 602 (428 SE2d 643) (1993).

Our laws specifically provide that a child may be deprived when he is without proper parental control, "or control necessary for [his] physical, mental, or emotional health or morals." OCGA § 15-11-2 (8) (A). Here, the evidence amply demonstrates that the mother is not able to control D. T. to the extent necessary for his mental, physical, or emotional health. The evidence further shows that the pair have a turbulent and unstable relationship that is complicated by D. T.'s mental and emotional issues. The mother appears to have resorted to using local police as pseudo co-parents to aid her in handling her difficulties with D. T. Such a stop-gap remedy cannot be beneficial for the well-being of the boy. We thus find that there is clear and convincing evidence that D. T. is deprived and the juvenile court did not err in finding such.

2. The mother next contends that the trial court lacked jurisdiction because the proceeding was a pretext for a custody battle. We do not agree.

The juvenile court has exclusive original jurisdiction over a child alleged to be deprived. See OCGA § 15-11-28 (a) (1) (C). We have held, however, that if the petition fails to make valid allegations of deprivation as defined by OCGA § 15-11-2 (8), the matter is not a deprivation proceeding within the jurisdiction of the juvenile court, but is a custody dispute that falls within the jurisdiction of the superior court. *In re M. C. J.*, 271 Ga. 546, 547 (523 SE2d 6) (1999). We further cautioned juvenile courts to "exercise great caution when entertaining deprivation proceedings brought by a non-parent to obtain custody from a parent." (Citations omitted.) *In the Interest of K. R. S.*, 253 Ga. App. 678, 679 (1) (560 SE2d 292) (2002). We must evaluate a deprivation petition on its own merits, considering the specific facts

of the case, in determining whether it is in fact a custody matter for the superior court. *In re M. C. J.*, supra.

Here, the deprivation proceeding was brought by DFACS amid multiple referrals dating back almost 16 months. Moreover, there was no evidence that the father was contesting custody or was attempting to acquire custody. The father testified that D. T. needed to stay "right where he is."

> [W]here there are unchallenged, valid allegations of deprivation and no evidence that the parents were engaged in any custody dispute prior to the instances of deprivation, we cannot say that the deprivation proceeding was a disguised custody matter. Accordingly, the juvenile court properly exercised its jurisdiction over the deprivation proceeding.

(Footnote omitted.) *In the Interest of K. L. H.*, 281 Ga. App. 394, 396-397 (636 SE2d 117) (2006).

3. The mother also contends that the juvenile court erred in denying her motion to dismiss DFACS's deprivation petition. She argues that the trial court should have dismissed the petition because DFACS failed to follow statutorily mandated procedures for review and assistance resulting in a four-month delay for an adjudicatory hearing.

(a) The mother argues that the trial court erred in denying her motion to dismiss the deprivation petition because the delay in the deprivation hearing for four months from March 2005 when D. T. was removed to August 23, 2005, the date the adjudicatory hearing was held, violated her due process rights. She maintains that she did not waive her right to a probable cause hearing contrary to the trial court's order stating otherwise.

The evidence shows that a probable cause order was entered on April 14, 2005 in which the juvenile court stated that the mother through her attorney "waived her right to a probable cause hearing and stipulated to a finding of deprivation." That order showed that the case was originally set for an adjudicatory hearing on April 13, 2005, but the parties agreed to continue the hearing so that it could be specially set. At the August adjudicatory hearing, the mother moved to dismiss the petition because of the delay but the juvenile court found that, while "concerned by the delay, . . . the statute allows for [a continuance on] good cause," and found that good cause existed because of extreme delays in the juvenile docket. The juvenile court also noted the due process concerns, but found that

> the Constitutional rights of the parents are protected by the fact that the department is going to have to show present

deprivation. . . . There has been a four-month delay, but based on the probable cause finding the parents are placed on notice of what the allegations are. So as you have stated, today is your day for trial. Either first of all they prove there is deprivation or not. If [DFACS] can't prove deprivation, the case is dismissed. If the department proves deprivation, then they have to prove it's present.

We note at the onset that "[a] juvenile court has the authority to grant a continuance of a properly set deprivation hearing, for good cause, even beyond the statutory limitations for the time of the hearing. A trial court's decision to grant or to deny a continuance will not be disturbed absent abuse of discretion." (Citations omitted.) *In the Interest of T. R.*, 270 Ga. App. 401, 401-402 (1) (606 SE2d 630) (2004). That being so, we find that the juvenile court properly exercised its discretion in continuing the deprivation hearing beyond the statutory period. We do, however, recognize the due process implications of a four-month delay between removal of a child and the adjudicatory hearing finding deprivation.

Our Supreme Court has recognized that the

freedom of personal choice in matters of family life is a fundamental liberty interest, protected by the United States Constitution, and that the right to the custody and control of one's child is a fiercely guarded right in our society and in our law. It is a right that should be infringed upon only under the most compelling circumstances.

(Punctuation and footnotes omitted.) *Watkins v. Watkins*, 266 Ga. 269, 270 (1) (466 SE2d 860) (1996). "The fundamental idea of due process is notice and an opportunity to be heard. . . . As parties to a deprivation hearing, parents are entitled to notice and an adequate opportunity to be heard." (Citations and punctuation omitted.) *In the Interest of A. J.*, 269 Ga. App. 580, 581 (1) (604 SE2d 635) (2004). However, unless the mother can establish that she was harmed by the alleged due process violation, reversal is not required. *In the Interest of M. S.*, 279 Ga. App. 254, 261 (1) (630 SE2d 856) (2006).

Here, the juvenile court found that the mother waived the probable cause hearing and stipulated as to the deprivation, which served as sufficient notice of the allegations she was facing. The mother's assertion that the waiver never happened is not supported with anything more than her repeated denials. Moreover, the mother cannot show any harm resulting from the delay, as the evidence shows that she agreed to have D. T. live with the paternal grandmother during this time period.

(b) The mother also argues that the trial court should have dismissed the petition because she did not receive a case plan during the four months preceding the adjudicatory hearing.

OCGA § 15-11-58 (b) provides, in pertinent part, that,

> [w]ithin 30 days of the date a child who is placed in the custody of the Department . . . is removed from the home and at each subsequent review of the disposition order, the [Department] must submit a written report to the court which shall either include a case plan for a reunification of the family or include a statement of the factual basis or bases for determining that a plan for reunification is not appropriate.

The DFACS caseworker testified that a case plan was never submitted because D. T. had not been adjudicated and the juvenile court preferred to order goals for DFACS to put in the case plan. She stated that the department was waiting to get the decision of the juvenile court to develop the plan. She further testified that while there was no plan in place, DFACS was providing multiple services to the family while the child was placed with the grandmother, including monitoring, transportation, behavior aid, and wrap-around services. She added that "the courts here in Cherokee County would like us to have a case plan that's developed based on what the court feels we should have in that case plan and that is usually set by the court at the adjudicatory hearing." She acknowledged that the delay in the hearing prevented DFACS from developing a case plan.

In *In the Interest of B. D.*, 281 Ga. App. 725, 728 (3) (637 SE2d 123) (2006), the father argued that his due process rights were violated because his parental rights were terminated despite the fact that he never received a copy of the case plan. We held that unless the father could establish that he was harmed by the alleged due process violation, reversal was not required. Id. Likewise, here, pretermitting any alleged violation, the mother has not shown how she was harmed by DFACS's failure to submit a case plan during the four-month period. Moreover, the evidence shows that there was a safety plan in place after D. T. was removed from the house, that DFACS was providing services during that time period, and that many attempts to contact the mother to discuss a case plan were unsuccessful.

Thus, we find no merit to this enumeration.

*Judgment affirmed. Andrews, P. J., and Bernes, J., concur.*

DECIDED MARCH 20, 2007.

*Susan M. Robinson, Jean M. Kutner*, for appellant.

*Thurbert E. Baker, Attorney General, Shalen S. Nelson, Senior Assistant Attorney General, Charissa A. Ruel, Assistant Attorney General, Hope M. Pereira*, for appellee.