670 S.E.2d 858 (2008)
In the Interest of A.R. et al., children.
No. A08A1088.
Court of Appeals of Georgia.
December 1, 2008.
*859 Tran H. Lankford, for appellant.
Thurbert E. Baker, Attorney General, Shalen S. Nelson, Senior Assistant Attorney General, Elizabeth M. Williamson, Assistant Attorney General, Daniel C. Thomas, for appellee.
PHIPPS, Judge.
The juvenile court adjudicated A.R., J.R., and R.R. deprived and then ordered that a case plan for their reunification with their father be revised to nonreunification. The father challenges the sufficiency of the evidence, complains about the admission of evidence, and argues that he was entitled to a mistrial. Because the father has shown no merit in any of his claims of error, we affirm.
1. The father contends that the evidence was insufficient to support a finding that the children were deprived.
A child is "deprived" if he or she is "without proper parental care or control, subsistence, education as required by law, or other care or control necessary for the child's physical, mental, or emotional health or morals."[1] Where sufficiency of the evidence is challenged,
we review the evidence in the light most favorable to the juvenile court's judgment to determine whether any rational trier of fact could have found by clear and convincing evidence that the child was deprived. This Court neither weighs evidence nor determines the credibility of witnesses; rather, we defer to the [juvenile] court's fact-finding and affirm unless the appellate standard is not met.[2]
So viewed, the evidence showed that on January 20, 2006, the Newton County Department of Family and Children Services (DFCS) filed a deprivation petition on behalf of then two-year-old A.R, one-year-old J.R., and two-month-old R.R. The petition alleged that the infant R.R. had recently been admitted to Children's Healthcare of Atlanta Hospital with multiple fractures in various healing stages and that medical doctors had reported the child's injuries as indicative of child abuse; and that the children's *860 mother had a substance abuse history, had been diagnosed as having a bi-polar disorder, and was not taking medication for the condition. Three days later, the juvenile court conducted a seventy-two-hour hearing. The father, who had been arrested in connection with the child's injuries, was brought from jail to the hearing and consented to proceed with the hearing without an attorney. During the hearing, the father reported that he could not provide for the children because he was incarcerated. The juvenile court entered an order finding probable cause to believe that the children were deprived pursuant to OCGA § 15-11-2(8)(A) and placed them in DFCS's custody.
The day after the hearing, the father obtained counsel. In February, he and the children's mother signed case plans for reunification with their children. During the subsequent seven months, the juvenile court held numerous hearings upon the deprivation petition. The father was present at the hearings and represented by counsel.
The following evidence was adduced at the hearings. A forensic pediatrician with Children's Healthcare of Atlanta, who had worked in the hospital's child protection center for 14 years and who had examined R.R. on January 23, 2006, testified as an expert in forensic pediatrics to the following. The two-month-old was "very fussy when his left leg was moved"; that he had "swelling and tenderness of the left lower extremity" of his left leg; that he also was tender just above his left knee; and that he had bruising over his right cheek. She thus requested that x-rays, a CT scan of the baby's head, an ultrasound of his hips, an MRI, and a skeletal survey be performed on him.
After reviewing the results of these tests, the forensic pediatrician concluded that R.R. had "an acute bucket handle fracture of the distal left femur, with associated soft tissue swelling." This injury, the doctor described, could have been caused only by "a violent whipping," "yanking," "jerking," or "violent jerking." The doctor determined that R.R. had sustained this injury within the previous two to five days. The doctor also detected a fracture on R.R.'s "left lower part of the leg, the left tibia." This fracture appeared to have been about the same age as the other fracture and to have been caused by the same violent "whipping mechanism." She further determined that "there [was] a second fracture at the top of the femur," which could have occurred about the same time as the other two injuries to R.R.'s left leg. In addition, the doctor saw that the baby had a healing bucket handle fracture of the right distal femur; a healing fracture of the middle portion of the right clavicle or collarbone; and compression fractures of two lumbar bodies of his spine. She testified that the compression fractures appeared to have been the result of his having been "slammed." The doctor further reported her concerns about "irregularities" in the ulna of both of R.R.'s forearms, which could have been caused by "jerking, by holding, by grabbing, by slamming, or whipping."
The forensic pediatrician testified that R.R.'s injuries had not been sustained at birth, nor did they result from any bone disease that would have caused the bones to be fragile. The doctor also ruled out as the cause of the injuries the mother's and father's initial claims of causation. According to the mother, one of R.R.'s siblings had stepped on him; and the father claimed that he (the father) had fallen while holding the baby. The doctor opined instead that R.R.'s injuries had been sustained by "non-accidental trauma" and that they clearly indicated child abuse.
A police officer interviewed the father about R.R.'s injuries after the father waived his Miranda rights. The officer testified that the father told him that during the preceding week, he had been the sole caretaker of R.R. during several days while the children's mother was out of town and that together they had taken care of him when she returned. In response to specific questions about R.R.'s injuries, the father recounted several recent incidents: he tripped forward and fell onto cement while holding the baby to his chest; he pushed the baby's legs back farther than he needed to while changing the baby's diaper; and he dropped the baby in his carrier onto the pavement of a parking lot. The father recalled that these incidents had occurred while he had been the *861 baby's sole caretaker. He admitted to the police officer that he had neither taken R.R. to a doctor or to a hospital after these incidents, nor reported the incidents to the mother when she returned home. Having heard these responses and furthered determined that the father had other "charges outstanding," the officer arrested the father. The officer testified that, in addition, the father had a "hold" on him regarding his immigration status. In connection with the instant case, the father was indicted for contributing to the deprivation of a minor, aggravated battery, and cruelty to children.
The mother recalled several arguments with the children's father since R.R.'s birth. She testified that the baby did not look like the father and that he thus suspected that R.R. was not his biological child. She testified, "I thought myself that that may be why he would have done something to the baby. But like I said, I don't know. I really don't know."
After the children entered DFCS's custody, their assigned foster care case manager maintained regular contact with them. In February, the case manager also met with the mother and father, when each signed reunification plans. Their plans were incorporated into a court order. According to the case manager, the father had no contact with any of the children since they had been placed in custody. The case manager referred the children for assessment evaluations.
A licensed clinical psychologist evaluated the children and further interpreted information obtained during developmental assessments, which had been administered by a trained individual working under the psychologist's supervision. The juvenile court determined that the psychologist was qualified as an expert witness in clinical psychology specializing in child, adolescent, and family psychology. The psychologist testified that, at about three months, R.R. did not appear to make eye contact with others, and his eyes did not appear to follow objects. In the areas of cognitive development, communication, and physical development, the doctor concluded that the child was below average. J.R. was one year and two months old when the psychologist observed him; he had no understandable speech and did not appear to have receptive language skills much better than his expressive language skills. His cognitive functioning, communication, and social emotional development were in the poor range. A.R. was evaluated at 31 months. Her verbal skills and emotional development were below average. The psychologist diagnosed A.R. with posttraumatic stress disorder.
By May 2006, the siblings had been placed with a foster mother. The foster mother testified the following August that R.R. initially had been fearful of baths, during which times he would cry loudly, flail his arms, and kick around. He calmed down several weeks later, about the time he seemed to recognize her as someone with whom he could feel safe. R.R. also had a difficult time sleeping in his crib and needed constant physical contact. J.R. arrived with ear infections that lasted for many weeks thereafter and resulted in partial hearing loss. He was "not very inquisitive about things" and was sometimes non-responsive to the foster mother  "no pointing or gesturing, no words except for the word `ball,'" referring to an item in which the child was very interested. Sometimes J.R. would "look blankly and cry for no particular reason." The foster mother testified that A.R. was developmentally delayed in that the child did not speak clearly, did not recognize the alphabet, and did not know the names of any colors. In addition, A.R. experienced bouts of anger and sometimes "acted out" in school, but the child was "getting better with it."
On November 20, 2006, the juvenile court entered an order finding the children deprived as to both parents. Regarding the father, the court cited incarceration and perpetration of, or failure to protect a child from, physical abuse. The juvenile court also granted DFCS's motion to revise the case plan from reunification to nonreunification, citing OCGA § 15-11-58(a)(4). Both parents contested the deprivation order by filing a motion for a new trial, but the mother thereafter surrendered her parental rights to the children. At a subsequent hearing, the father stipulated that he remained incarcerated *862 and that he had not been able to "do very much at all towards his case plan because of his current incarceration." The motion for new trial was denied.
The father contends on appeal that there was no evidence that he was the person who hurt R.R. However, the definition of deprived child within OCGA § 15-11-2(8)(A)
focuses upon the needs of the child regardless of parental fault. The deprivation petition is brought on behalf of the child and it is the child's welfare and not who is responsible for the conditions which amount to deprivation that is the issue. Therefore, deprivation is established by proof of parental unfitness arising from either intentional or unintentional misconduct resulting in the abuse or neglect of the child or by what is tantamount to physical or mental incapability to care for the child.[3]
There was evidence that R.R. was seriously and intentionally injured while in either the sole or joint care of his father. The children's mother has surrendered her parental rights to them; and the father's incarceration had rendered him unable to meet the goals of the reunification case plan. The psychologist who evaluated the children, as well as their foster mother, testified as to numerous ways the children were developmentally delayed when initially taken into DFCS's protective custody. And although the children's foster mother testified that they had overcome many of their initial struggles, a child living with a temporary guardian may nevertheless be found deprived because "the statutory finding of deprivation is based upon an absence of proper parental care or control."[4] The father cites no evidence that he had made any attempt to maintain a parental bond with any of his children, met any of the other goals of the reunification plans, or otherwise provided for the physical, mental, emotional, education, or moral needs of his children. Contrary to the father's contention, there was clear and convincing evidence that the children were deprived within the meaning of OCGA § 15-11-2(8) and that his misconduct or inability to care for their needs resulted in abuse or neglect sufficient to render him unfit.[5] Furthermore, the evidence was sufficient to authorize the grant of DFCS's motion for nonreunification.[6]
2. The father contends that the juvenile court erred by admitting medical records pertaining to R.R.'s hospitalization, arguing that the records were not authenticated and that they contained hearsay of "people's statements and findings." The father fails to provide any citation to the record and makes no attempt to specify the alleged hearsay.[7] Our review of the record, however, shows that the medical records department manager for the hospital testified that the documents apparently at issue constituted a certified copy of R.R.'s medical records maintained by the hospital. Generally, "[d]uring a nonjury trial, it is presumed that the court is able to sift the wheat from the chaff and select only the legal evidence."[8] And in this case, the juvenile court repeatedly confirmed that it would disregard any hearsay the documents contained. The father has shown no reversible error here.
*863 3. The father contends that the juvenile court erred by allowing in evidence the testimony of the forensic pediatrician and the clinical psychologist, arguing that their opinions were based upon "multiple hearsay." The father also complains that the forensic pediatrician's testimony went to the "the ultimate issue that [R.R.] was abuse[d] by the Parents," and he asserts that the clinical psychologist's opinions violated "the Ultimate Issue Rule."
The juvenile court qualified these witnesses to testify as experts in their respective fields. The forensic pediatrician thereafter testified that in formulating her opinion, she had examined R.R., the results from his x-rays and other tests, and various of the child's medical records. The clinical psychologist testified that in formulating her opinions, she met with each of the children; in addition, she interpreted results of developmental assessments that had been administered by an individual trained to administer such assessments and who was working under her supervision. And that individual testified as to how she administered the assessments and compiled various data. The father has failed to demonstrate that the experts' opinions should have been excluded.[9]
4. The father contends that the juvenile court erred by allowing in evidence testimony of the individual who conducted the developmental assessments under the supervision of the clinical psychologist, as well as testimony of the DFCS case manager. He claims that their testimony was based upon "multiple hearsay" and also violated the "Ultimate Issue Rule." The father has failed, however, to cite this court to any such impermissible testimony. No reversible error has been demonstrated.[10]
5. The father contends that the juvenile court erred by allowing in evidence testimony of "Ed Pierce," in addition to a report which the father claims was entitled "Report of Alcohol and Drug Problem Evaluation for [the children's mother]." He asserts that the evidence was based upon "multiple hearsay" and went to the ultimate issue concerning parental unfitness. The father provides no record cites to support these assertions; nor does he make any argument as to how he was prejudiced by evidence apparently introduced against the mother. This contention falls short of showing reversible error.
6. The father contends that the juvenile court erred by allowing in evidence three other exhibits, against which he makes a blanket assertion that the documents contained "multiple hearsay." In addition, he complains that the juvenile court allowed in evidence the indictment pertaining to his charge in connection with R.R.'s injuries, asserting that he had not been convicted for perpetrating any act against R.R. We presume that the juvenile court was able to sift the wheat from the chaff to consider only the legal evidence and thus find no reversible error.[11] In addition, with respect to the indictment, a police officer testified that the father was arrested in connection therewith, and the father's custody status was plainly an issue in this case.[12] No reversible error has been shown.
7. The father contends that the juvenile court erred by refusing to grant him a mistrial, asserting that he was "not given *864 production of documents immediately before the Hearings." The father has failed to substantiate this assertion by citation to the record; he has failed to identify or even describe the contents of the documents; moreover, he makes no argument as to how he was prejudiced.[13] This contention plainly falls short of showing reversible error.
8. The father contends that the juvenile court violated "his right to counsel in all proceedings." He has failed to demonstrate, however, any merit to this claim.[14]
Judgment affirmed.
BARNES, C.J., and JOHNSON, P.J., concur.
NOTES
[1] OCGA § 15-11-2(8)(A).
[2] In the Interest of D.T., 284 Ga.App. 336-337, 643 S.E.2d 842 (2007) (citation and punctuation omitted).
[3] In the Interest of J.P., 253 Ga.App. 732, 734, 560 S.E.2d 318 (2002) (citations and punctuation omitted).
[4] In the Interest of J.L. M., 204 Ga.App. 46, 48(1), 418 S.E.2d 415 (1992) (emphasis in original).
[5] See In the Interest of G.G., 253 Ga.App. 565, 569-570, 560 S.E.2d 69 (2002); In the Interest of J.V., 241 Ga.App. 621, 626-627, 526 S.E.2d 386 (1999); In the Interest of C.N., 231 Ga.App. 639, 640(1), 500 S.E.2d 400 (1998).
[6] See In the Interest of J.P., supra at 735-738, 560 S.E.2d 318 (presumption that reunification services should not be provided where parent has subjected child to aggravated circumstances, including, but not limited to, chronic abuse); see also In the Interest of D.B., 277 Ga.App. 454, 460(4), 627 S.E.2d 101 (2006) (presumption that reunification services should not be provided where parent has unjustifiably failed to comply with a previously court-ordered plan designed to reunite family).
[7] See generally Long v. Natarajan, 291 Ga.App. 814(1), 662 S.E.2d 876 (2008).
[8] In the Interest of C.G.B., 242 Ga.App. 705, 711(4), 531 S.E.2d 107 (2000) (punctuation and footnote omitted).
[9] See Thurman v. Applebrook Country Dayschool, 278 Ga. 784, 787(2), 604 S.E.2d 832 (2004) (expert opinion testimony, even on the ultimate issue to be decided by the factfinder, is admissible if the expert's conclusion is beyond the ken of the average layperson); In the Interest of J.P., supra at 737, 560 S.E.2d 318 (expert may rely on reports of others in formulating opinion); In the Interest of D.S.R., 246 Ga.App. 426, 428(3), 541 S.E.2d 61 (2000) (lack of personal knowledge on expert's part does not mandate exclusion of opinion, but presents a question as to the weight to be assigned the opinion).
[10] See Slmbey v. State, 288 Ga.App. 717-718, 655 S.E.2d 223 (2007); Court of Appeals Rule 25(c).
[11] See In the Interest of C.G.B., supra.
[12] See generally In the Interest of J.A.W., 281 Ga.App. 545, 547, 636 S.E.2d 725 (2006) (imprisonment alone does not automatically authorize a termination of parental rights premised upon parental unfitness; there must be circumstances in aggravation, and one such circumstance concerns whether the imprisoned parent has made an effort to communicate with the child and maintain a parental bond).
[13] See In the Interest of M.S., 279 Ga.App. 254, 261(1), 630 S.E.2d 856 (2006) (harm, as well as error, must be shown to warrant reversal).
[14] See Jenkins v. State, 240 Ga.App. 102, 103(1), 522 S.E.2d 678 (1999) (mere conclusory statements are not the type of meaningful argument contemplated by this court's rules).